```
1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF GEORGIA
2                          ATLANTA DIVISION

3

4
    UNITED STATES OF AMERICA    ) DOCKET NO. 1:14-CR-134-CAP
5                               )
                                ) ATLANTA, GEORGIA
6                               ) JULY 8, 2014
          V.                    )
7                               )
    APOLLO E. NIDA,             )
8                               )
             DEFENDANT.         )
9

10

                     TRANSCRIPT OF SENTENCING HEARING
11           BEFORE THE HONORABLE CHARLES A. PANNELL, JR.
                   SENIOR UNITED STATES DISTRICT JUDGE
12

13  APPEARANCES OF COUNSEL:

14  FOR THE GOVERNMENT:              ALANA R. BLACK
                                     ASSISTANT U.S. ATTORNEY
15
    FOR THE DEFENDANT:               THOMAS D. BEVER
16

17

18  COURT REPORTER:                  ANDY ASHLEY
                                     1994 U. S. COURTHOUSE
19                                   ATLANTA, GEORGIA  30303-3361
                                     (404) 215-1478
20

21

22            STENOTYPE/COMPUTER-AIDED TRANSCRIPTION

23

24

25


                     ANDRE G. ASHLEY, O.C.R.
```

1                    P R O C E E D I N G S

2  (ATLANTA, FULTON COUNTY, GEORGIA; JULY 8, 2014

3  IN OPEN COURT.)

4           THE COURT:  ALL RIGHT.  SOUND CASE 14-CR-134, UNITED

5  STATES OF AMERICA VERSUS APOLLO EDWARD NIDA SET DOWN TODAY FOR

6  SENTENCING.

7           IS THE GOVERNMENT READY?

8           MS. BLACK:  THE GOVERNMENT IS READY, YOUR HONOR.

9           THE COURT:  DEFENSE READY?

10          MR. BEVER:  DEFENSE IS READY, YOUR HONOR.

11          THE COURT:  ALL RIGHT.  THE COURT HAS THE PRESENTENCE

12 REPORT AND WOULD LIKE TO ADOPT THE PORTIONS OF THE PRESENTENCE

13 REPORT TO WHICH THERE IS NO OBJECTION AND MAKE THOSE THE

14 FINDINGS OF THE COURT.

15          IS THERE ANY PROBLEM WITH THAT ON BEHALF OF THE

16 GOVERNMENT?

17          MS. BLACK:  NONE, YOUR HONOR.

18          THE COURT:  ON BEHALF OF THE DEFENDANT?

19          MR. BEVER:  YOUR HONOR, THERE ARE A COUPLE OF THINGS

20 IN THE PSR THAT I'D LIKE TO ADDRESS.

21          THE COURT:  OKAY.  ANY OBJECTIONS?  YOU HAD ONE

22 OBJECTION, AND I THINK WITHDREW IT.

23          MR. BEVER:  RIGHT.  THERE'S ALSO AN OBJECTION IN

24 TERMS OF ROLE IN THE OFFENSE, THAT'S AN OBJECTION.

25          THE COURT:  OKAY.  WELL, WHAT I WANT TO DO IS ADOPT

ANDRE G. ASHLEY, O.C.R.

1   THE PORTIONS OF THE PRESENTENCE REPORT TO WHICH THERE ARE NO

2   OBJECTIONS.

3           MR. BEVER:  WE HAVE AN ADDITIONAL OBJECTION WHICH IS

4   WITHIN THE DISCRETION OF THE COURT THAT WE'D LIKE TO MAKE AT

5   PRESENT, AND IT'S UNCLEAR WHETHER IT REALLY IS AN OBJECTION TO

6   THE PSR, OR WHETHER IT'S PART OF A VARIANCE FOR THE PURPOSES OF

7   THE CRIMINAL HISTORY CATEGORY.  SO I'D LIKE TO STATE IT TO THE

8   COURT AT PRESENT AS ON OBJECTION.

9           THE COURT:  OKAY.  THE CRIMINAL HISTORY IS

10  OVERSTATED; IS THAT YOUR OBJECTION?  I READ YOUR BRIEFS.

11          MR. BEVER:  RIGHT, SPECIFICALLY WITH RESPECT TO

12  THE -- IN TERMS OF THE PSR, IT WOULD HAVE TO DO WITH PARAGRAPHS

13  141 AND 142 WHICH ARE --

14          THE COURT:  WAIT A MINUTE.  I'M GOING TO ADOPT THE

15  PORTIONS OF THE PRESENTENCE REPORT WHICH HAS NOT BEEN OBJECTED

16  TO, AND I'LL HEAR ALL OF YOUR OBJECTIONS.

17          OKAY.  NOW, THE GOVERNMENT AND THE DEFENSE BOTH

18  OBJECT TO ROLE IN THE OFFENSE.  I'LL SAVE US TIME AND SUSTAIN

19  THAT OBJECTION.  THAT REDUCES HIS SCORE BY TWO POINTS.

20          WHAT'S YOUR NEXT OBJECTION?

21          MR. BEVER:  YOUR HONOR, ON THE CRIMINAL HISTORY

22  CATEGORY PAGE 32 AND 33, PARAGRAPHS 141 AND 142 WHICH HAVE TO

23  DO WITH THEFT BY RECEIVING STOLEN PROPERTY AT PAGE 18 IN BOTH

24  MARCH AND IN SEPTEMBER OF 1997, THOSE ARE ALSO LATER ON

25  INCLUDED AS PART OF A COMMON SCHEME AND CONSPIRACY IN THE RICO


                    ANDRE G. ASHLEY, O.C.R.

1    CHARGE WHICH THE CLIENT SPENT TIME FOR AND WHICH HE'S ALSO

2    RECEIVED POINTS FOR AT PARAGRAPH 146.

3              THE OBJECTION THAT I WOULD HAVE IS THAT IN THE RICO

4    ITSELF IT DESCRIBES PARAGRAPHS 141 AND 142 AS BEING PART OF THE

5    SAME CONSPIRACY AND PLAN.  WHEN I LOOKED JUST THIS MORNING

6    LITERALLY AT SECTION 1B1.3 AND LOOKED AT THE COMMENTARY IN

7    TERMS OF THE APPLICATION NOTES, SPECIFICALLY PARAGRAPH 9, IT

8    JUST SEEMS TO ME THAT THERE'S WHAT I WOULD CALL AS A PRACTICAL

9    MATTER DOUBLE COUNTING OF THAT PARAGRAPH 141 AND 142 BECAUSE

10   THEY'RE GETTING SEPARATE POINTS.  141 IS GETTING 3 POINTS AND

11   142 IS GETTING ONE POINT.  SO THEY'RE GETTING FOUR POINTS FOR

12   CONDUCT WHICH IS ALSO INCLUDED LATER ON AS PART OF THE RICO

13   CHARGE.

14             THE COURT:  ARE YOU SURE BECAUSE THERE'S SEVERAL

15   YEARS DIFFERENCE --

16             MR. BEVER:  THERE IS.

17             THE COURT:  -- AND RICO --

18             MR. BEVER:  MY OBJECTION IS NOT THAT THEY'RE

19   PREDICATE ACTS TO THE RICO, BUT INSTEAD IT SEEMS TO ME THAT FOR

20   RELEVANT CONDUCT PURPOSES THOSE SHOULD HAVE BEEN GROUPED

21   TOGETHER PARAGRAPHS 141 AND 142 FOR COUNTING PURPOSES.

22             SINCE UNDER RELEVANT CONDUCT THEY'RE PART OF THE SAME

23   ONGOING ENTERPRISE, IF YOU WILL, THE SAME COMMON SCHEME, THE

24   SAME COMMON PLAN, AND SO HE'S BEING -- ESSENTIALLY HE'S GETTING

25   POINTS I THINK EXCESSIVELY COUNTED ON THOSE TWO SEPARATE -- ON


                    ANDRE G. ASHLEY, O.C.R.

1   THOSE TWO OFFENSES THAT ARE SEPARATED BY PARAGRAPHS 141 AND

2   142.

3           SO I WOULD OBJECT ON THAT BASIS, AND IN THE

4   ALTERNATIVE, I WOULD INCLUDE IT IN MY VARIANCE FOR THE CRIMINAL

5   HISTORY CATEGORY OVERSTATING THE SERIOUSNESS OF MR. NIDA'S

6   CRIMINAL HISTORY.

7           THE COURT:  OKAY.  NOW LET ME MAKE SURE I UNDERSTAND

8   THE OBJECTION.  LET'S SEE, HE'S GETTING 3 POINTS IN PARAGRAPH

9   141 FOR THEFT BY RECEIVING WHEN HE WAS AGE 18, AND THEN HE'S --

10  WELL, LET'S SEE, HE WAS SENTENCED IN 97, PROBATION REVOKED IN

11  98, AND THEN IN 97 HE WAS ALSO CONVICTED OF THEFT BY RECEIVING

12  STOLEN PROPERTY AND A CONCEALED WEAPON AND OTHER OFFENSES IN

13  COBB COUNTY, THAT'S ONE POINT, BUT NOW ARE YOU CLAIMING THAT

14  PARAGRAPH 142 IS PART OF THIS?  I'M ASKING MR. BEAVER.

15          MR. BEVER:  WHAT I'M SAYING IS IS THAT WE OBJECT TO

16  THERE BEING 3 POINTS FOR 141 AND ALSO ONE POINT FOR 142 IN THAT

17  IT SEEMS TO ME GIVEN THAT IT'S PART OF THE SAME COMMON SCHEME

18  AND PLAN ACCORDING TO THE RICO ALLEGATIONS THAT IT'S EXCESSIVE

19  COUNTING TO BE GIVING POINTS TO BOTH SEPARATE PARTS OF THE SAME

20  SCHEME.

21          THE COURT:  ALL RIGHT.  SO YOU THINK -- HOW MANY

22  POINTS DO YOU THINK IT OUGHT TO BE REDUCED?  I'M TRYING TO MAKE

23  SURE I UNDERSTAND.

24          MR. BEVER:  OUR POSITION, YOUR HONOR, WOULD BE THE

25  FOLLOWING IS THAT I WOULD THINK THAT THE POINTS IN 141 AND 142

ANDRE G. ASHLEY, O.C.R.

1  TO THE EXTENT THAT THOSE ARE AS A RESULT OF THE UNDERLYING

2  OFFENSES WOULD BE THE SAME SINCE IT'S PART OF THE SAME COMMON

3  SCHEME AND PLAN UNDER RELEVANT CONDUCT.

4          THE COURT:  SO THOSE OUGHT TO BE COMBINED, AND HE

5  OUGHT TO HAVE NO MORE THAN 3 POINTS?

6          MR. BEVER:  CORRECT.

7          THE COURT:  IS THERE ANOTHER OBJECTION ABOUT HIS

8  CRIMINAL HISTORY?

9          MR. BEVER:  WE HAD IN A FOOTNOTE AS THE COURT IS

10  AWARE, WE HAD OBJECTED EARLIER TO 145.  WE'VE HAD DISCUSSIONS

11  WITH MS. OSWALD OF THE PROBATION OFFICE.  SHE HAS EXPLAINED THE

12  BASIS OF THAT.  WE HAVE RESEARCHED THAT, AND WE WITHDRAW THAT

13  OBJECTION.

14          THE COURT:  ACTUALLY YOU SHOULD HAVE GOTTEN TWO

15  POINTS.  THIS IS THE DUI -- NO.  IS THIS THE ONE HE HAD A

16  PROBATION REVOCATION?  THERE WAS ONE THAT WAS JUST -- I LOOKED

17  AT, AND HE'S JUST GOT A ONE POINT, BUT THEN ACTUALLY HE HAD HIS

18  PROBATION REVOKED DURING THAT ONE WHICH SHOULD HAVE ADDED

19  ANOTHER POINT BUT DID NOT.

20          THE PROBATION OFFICER:  THAT'S PARAGRAPH 145.

21          THE COURT:  145.  OKAY.  ALL RIGHT.  WHAT ELSE, MR.

22  BEVER?

23          MR. BEVER:  THAT IS -- THAT'S IT, YOUR HONOR, AS FAR

24  AS THE OBJECTIONS TO THE PSR.  THERE WILL BE AN ISSUE LATER ON

25  WE'LL RAISE NOT RESPECT TO THE LOSS BUT SIMPLY AN ISSUE WITH


                    ANDRE G. ASHLEY, O.C.R.

1  RESPECT TO RESTITUTION, BUT I DON'T KNOW WHETHER THE COURT

2  WOULD PREFER WE DO THAT NOW OR TOWARDS THE END OF THE

3  PROCEEDING.

4          THE COURT:  WELL GIVE ME JUST A MINUTE HERE.  OKAY.

5  WELL, LET'S SEE, WHAT DOES THE GOVERNMENT SAY ABOUT HIS

6  OBJECTION?

7          MS. BLACK:  YOUR HONOR, ON THE POINT ABOUT THE TWO

8  DIFFERENT CAR THEFTS THAT ARE ADDRESSED IN THE CRIMINAL HISTORY

9  SUMMARY AT PARAGRAPHS 141 AND 142, THOSE ARE NOT A COMMON

10 SCHEME OR PLAN.  IT'S TWO SEPARATE CARS THAT WERE STOLEN MONTHS

11 APART WITH AN INTERVENING ARREST.  SO THAT'S JUST RECIDIVISM.

12 IT'S NOT ANY SORT OF OVERLAPPING PLEADINGS OR CHARGES WHERE HE

13 WOULD BE ENTITLED TO HAVING THE POINTS DISCOUNTED.  SO WE WOULD

14 OPPOSE THAT ARGUMENT.

15         THE COURT:  WELL, YOU ALL ARE ARGUING OVER ONE POINT

16 THAT DOESN'T MAKE ANY DIFFERENCE IN HIS CRIMINAL HISTORY

17 CATEGORY.

18         MS. BLACK:  NO, YOUR HONOR, IT DOESN'T, BUT LATER IN

19 THIS PROCEEDING, I BELIEVE MR. NIDA WILL ARGUE THAT HIS

20 CRIMINAL HISTORY CATEGORY OVERSTATES HIS CRIMINAL HISTORY, AND

21 HE'LL BE WANTING TO ARGUE THAT HE WAS CLOSE TO THE LINE.

22         THE COURT:  BUT HE'S ALREADY SHORT ONE POINT THAT

23 SHOULD HAVE BEEN ADDED THAT THE PROBATION OFFICER MISSED.

24         OKAY.  WELL, LET'S GO ONTO THE -- I GUESS IF YOU'RE

25 GOING TO TAKE UP RESTITUTION, WE MIGHT AS WELL TAKE THAT UP

1  NOW, TOO.

2           MR. BEVER:  ALL RIGHT.  YOUR HONOR, RESTITUTION IS

3  DIFFERENT THAN THE LOSS AMOUNT.  WE'VE STIPULATED TO THE LOSS

4  AMOUNT, AND THE LOSS AMOUNT IN THE PSR COMES OUT AT

5  APPROXIMATELY 1.9 MILLION DOLLARS, AND WE ARE NOT CONTESTING

6  THE LOSS AMOUNT HERE.

7           WE HAVE THE FINAL LISTING OF THE RESTITUTION AMOUNT,

8  AND THE CONCERN ON RESTITUTION IS SEPARATE.  WE HAVE AGREED TO

9  RESTITUTION.  IT'S OBVIOUSLY GOING TO BE PART OF THE COURT'S

10  ORDER, BUT IT'S IMPORTANT FOR US TO BE ACCURATE FOR THE

11  PURPOSES OF THE VICTIMS, AND THE CONCERN IS THAT IN SOME OF

12  THESE COUNTS, IT APPEARS THAT THERE IS EXCESS COUNTING IN THIS

13  SENSE.

14           IF WE TAKE ONE OF THE VICTIMS, FOR EXAMPLE, DIGITAL

15  FEDERAL CREDIT UNION WHICH HAD A 45,000 DOLLAR TOTAL AMOUNT,

16  20,000 DOLLARS OF THAT WAS TAKEN OUT OF THE ACCOUNT.  SO

17  THERE'S NO QUESTION THAT FOR RESTITUTION PURPOSES THEY WOULD BE

18  OWED 20,000 DOLLARS, BUT THERE'S 25,000 DOLLARS WHICH REMAINED

19  IN THE ACCOUNT WHICH SHOULD NOT BE PART OF THE RESTITUTION, AND

20  WE BELIEVE THAT THERE MAY BE OTHER INDEED VICTIMS OF THE SAME

21  NATURE WHERE THERE'S EXCESS COUNTING.

22           I DON'T KNOW EXACTLY HOW TO REMEDY THAT BECAUSE WE

23  DON'T HAVE ACCESS TO THE SAME INFORMATION, ALTHOUGH THIS IS THE

24  SAME INFORMATION WHICH WAS IN THE PSR --

25           THE COURT:  HOLD ON A MINUTE.  HAVE YOU DISCUSSED

ANDRE G. ASHLEY, O.C.R.

1   THIS WITH THE GOVERNMENT?

2           MR. BEVER:  I HAVE NOT IN TERMS OF THIS OBJECTION,

3   YOUR HONOR.  I DO BELIEVE THAT DURING LIKE A FIVE OR TEN MINUTE

4   BREAK WE COULD PROBABLY GET IT RESOLVED.

5           THE COURT:  OR I COULD SET ANOTHER HEARING ON

6   RESTITUTION.  PROCEED WITH THE SENTENCING TODAY AND SET A LATER

7   DATE FOR THE HEARING ON RESTITUTION.

8           MR. BEVER:  THAT MIGHT BE WISE IN TERMS OF EFFICIENCY

9   TODAY.

10          THE COURT:  WELL, LET'S PROCEED WITH THE SENTENCING,

11  AND THEN WE'LL SEE WHERE YOU ARE IN RESTITUTION.  I DON'T

12  PARTICULARLY WANT TO TAKE A BREAK.

13          MR. BEVER:  ALL RIGHT.

14          THE COURT:  WE'LL LEAVE RESTITUTION EITHER TO BE

15  RESOLVED LATER TODAY OR AT ANOTHER HEARING THAT WE'LL SET AT A

16  LATER DATE.

17          MS. BLACK:  YOUR HONOR, BEFORE WE MOVE ON I JUST

18  WANTED TO NOTE THAT IN THE PLEA AGREEMENT MR. NIDA DOES AGREE

19  TO PAY RESTITUTION TO ALL RELEVANT CONDUCT, AND SO WHILE MR.

20  BEVER SAYS HIS OBJECTION TO RESTITUTION IS NOT AN OBJECTION TO

21  LOSS AMOUNT, I WANT TO MAKE SURE WE'RE ON THE SAME PAGE ABOUT

22  THAT.  BECAUSE LOSS AMOUNT OBVIOUSLY DOES HAVE TO BE FACTORED

23  INTO THE COURT'S TODAY PART OF THE SENTENCING EVEN IF

24  RESTITUTION IS PUT OFF.

25          THE COURT:  HE AGREES TO THE LOSS AMOUNT.


                    ANDRE G. ASHLEY, O.C.R.

1          MR. BEVER:  YES, SIR.

2          THE COURT:  I'VE HAD A LOT OF CASES WHERE THE LOSS

3  AMOUNT IS DIFFERENT FROM THE RESTITUTION.

4          MS. BLACK:  IF THAT'S THE CASE, WE HAVE NO OBJECTION

5  TO PUSHING BACK THE RESTITUTION IF THERE IS A SPECIFIC

6  QUESTION.

7          THE COURT:  ALL RIGHT.  WELL AT THIS POINT, LET'S

8  SEE, I CAN STATE THE GUIDELINE CALCULATION BECAUSE I KNOW THE

9  GOVERNMENT IS GOING TO MOVE FOR A DOWNWARD DEPARTURE.

10          WELL, YOU ALL CAN CORRECT ME IF I'M WRONG, I BELIEVE

11  THE GUIDELINE CALCULATION IS THE STATUTORY PENALTY IN THE CASE

12  IS UP TO 30 YEARS IN CONFINEMENT, A MILLION DOLLARS OR BOTH.

13  THERE IS NO MANDATORY MINIMUM.  AT THIS POINT HE HAS A TOTAL

14  OFFENSE LEVEL OF 30, A CRIMINAL HISTORY CATEGORY ROMAN

15  NUMERAL V, THAT GIVES A CUSTODY GUIDELINE RANGE OF 151 TO 188

16  MONTHS, A FINE GUIDELINE RANGE OF 15,000 TO 150,000,

17  RESTITUTION TO BE DETERMINED, SPECIAL ASSESSMENT OF 100

18  DOLLARS.  THERE IS A FORFEITURE PROVISION.  NO PROBATION

19  OPTION.  SUPERVISED RELEASE OF THREE TO FIVE YEARS, AND IT'S

20  NOTED HE IS A UNITED STATES CITIZEN NOT SUBJECT TO

21  DEPORTATION.

22          ALL RIGHT.  THE COURT WILL ADOPT THOSE AS THE

23  GUIDELINE CALCULATIONS, AND NOW WE CAN TAKE UP THE GOVERNMENT

24  HAS A MOTION THAT IT WISHES TO MAKE?

25          MS. BLACK:  YES, YOUR HONOR, THERE'S A SEALED MOTION,


                    ANDRE G. ASHLEY, O.C.R.

1  AND IN ADDITION THE GOVERNMENT ALSO PURSUANT TO THE PLEA

2  AGREEMENT IS ASKING FOR A ONE POINT DOWNWARD DEPARTURE FOR

3  JUDICIAL ECONOMY.

4          THE COURT:  ALL RIGHT.  I WILL GRANT THE ONE POINT

5  FOR JUDICIAL ECONOMY.  TELL ME ABOUT THE 5K?

6          MS. BLACK:  YOUR HONOR, THE GOVERNMENT'S PLACED A

7  DETAILED DESCRIPTION OF THE BASIS FOR ITS MOTION IN WRITING AND

8  WOULD STAND ON THOSE PLEADINGS TO THE COURT.

9          THE COURT:  ALL RIGHT.  BUT YOU'RE RECOMMENDING THAT

10 THE COURT GO DOWN FIVE LEVELS --

11         MS. BLACK:  THAT'S RIGHT, YOUR HONOR, WE'RE

12 RECOMMENDING --

13         THE COURT:  -- UNDER 5K1.1 FOR HIS COOPERATION?

14         MS. BLACK:  EXACTLY FIVE LEVELS, YOUR HONOR.

15         THE COURT:  OKAY.  THE DEFENSE WISH TO BE HEARD?

16         MR. BEVER:  I DO, YOUR HONOR.  NUMBER 1, WE, OF

17 COURSE, WOULD ALSO ASK FOR THE VARIANCE OF THE ONE LEVEL FOR

18 THE EARLY COOPERATION WHICH IS IN THE PLEA AGREEMENT.

19         IN ADDITION WITH RESPECT TO THE DOWNWARD DEPARTURE

20 THAT THE GOVERNMENT HAS JUST DESCRIBED, WE, OF COURSE, CONCUR

21 IN THAT MOTION, BUT WE DIFFER IN TERMS OF THE AMOUNT FOR

22 REASONS WHICH WE HAVE EXPLAINED IN OUR MOTION AND ARE SEEKING A

23 TEN LEVEL DEPARTURE ON THE BASIS ARTICULATED IN OUR MOTION.

24         THE COURT:  WELL, I KNOW -- BUT YOU'RE STARTING AT A

25 HIGHER LEVEL, BUT THE BOTTOM LINE IS YOU WANT THE COURT TO COME

1  DOWN TO, I THINK TO A LEVEL 22; IS THAT RIGHT?

2          MR. BEVER:  WE WOULD CERTAINLY TAKE THAT, YOUR HONOR,

3  IN LIEU OF THE RECOMMENDATION BY THE GOVERNMENT.  WE WOULD

4  STILL FEEL THAT IN TERMS OF THE AMOUNT OF WHAT THE CLIENT HAS

5  DONE THAT IT WOULD JUSTIFY THE TEN LEVELS, AND I'D LOVE TO BE

6  ABLE TO ARGUE IT TO THE COURT PRIVATELY EITHER IN CHAMBERS OR

7  WITH THE COURTROOM CLEARED, EITHER ONE.

8          THE COURT:  WELL, I HAVE YOUR MOTION, AND I'VE READ

9  IT AND STUDIED YOUR MOTION.  IS THERE REALLY ANY NEED -- AND I

10 REALLY DON'T WANT TO TAKE UP TO THINGS OUTSIDE THE PRESENCE OF

11 THE PUBLIC.  WE RUN OUR COURTS IN PUBLIC.  IS THERE REALLY ANY

12 NEED FOR ANY FURTHER DISCUSSION OTHER THAN WHAT YOU'VE STATED

13 IN YOUR BRIEF?

14         MR. BEVER:  IF I MAY HAVE ONE MOMENT, YOUR HONOR, IT

15 MAY SAVE SOME TIME.

16         THE COURT:  OKAY.

17         (PAUSE IN THE PROCEEDINGS.)

18         MR. BEVER:  YOUR HONOR, I BELIEVE THAT EVERYTHING

19 THAT IS MATERIAL AND THAT IS IMPORTANT IS INCLUDED IN OUR

20 BRIEF, AND WE WILL REST ON OUR BRIEF.

21         THE COURT:  ALL RIGHT, SIR.  WELL, OF COURSE, I'LL

22 GRANT THE ONE POINT FOR EARLY TERMINATION OF THE CASE,

23 CONTESTING THE CASE, AND I'LL GRANT THE MOTION OF THE

24 GOVERNMENT TO TAKE HIM DOWN FIVE LEVELS PURSUANT TO THEIR

25 5K1.1.


                    ANDRE G. ASHLEY, O.C.R.

```
 1              IS THERE ANYTHING ELSE I NEED TO CONSIDER BEFORE I
 2  MAKE ANOTHER GUIDELINE CALCULATION?
 3              MS. BLACK:  NOTHING FROM THE GOVERNMENT, YOUR HONOR.
 4              THE COURT:  OKAY.  THAT GETS HIM DOWN TO A 24.
 5  OKAY.  SO WITH THAT THE GUIDELINE CALCULATION IS THE STATUTORY
 6  PENALTY WILL STILL BE UP TO 30 YEARS CONFINEMENT, A MILLION
 7  DOLLAR FINE OR BOTH, NO MANDATORY MINIMUM, TOTAL OFFENSE LEVEL
 8  OF 24, CRIMINAL HISTORY CATEGORY ROMAN NUMERAL V, THAT GIVES A
 9  CUSTODY GUIDELINE RANGE OF 92 TO 115 MONTHS, FINE GUIDELINE
10  RANGE OF 10,000 TO 100,000, RESTITUTION TO BE DETERMINED, 100
11  DOLLAR SPECIAL ASSESSMENT, THERE IS A FORFEITURE PROVISION, NO
12  PROBATION OPTION, AND, OF COURSE, HE'S A UNITED STATES
13  CITIZEN.  IF THERE'S NO OBJECTION, THE COURT WILL ADOPT
14  THOSE AS THE GUIDELINE CALCULATIONS AT THIS POINT IN THE
15  PROCEEDING.
16              OKAY.  WHAT DO YOU WANT TO TAKE UP NEXT?
17              MR. BEVER:  YOUR HONOR, WE HAVE A DOWNWARD DEPARTURE
18  BASED ON CRIMINAL HISTORY WHICH WOULD PROBABLY BE THE NEXT
19  CATEGORY TO TAKE UP.  WE HAVE A VARIANCE WHICH WE HAVE FILED
20  SEEKING -- BASED UPON HIS POOR UPBRINGING.  WE HAVE BOTH HIS
21  MOTHER AND HIS BROTHER WHO WOULD LIKE TO MAKE A RELATIVELY
22  BRIEF STATEMENT TO THE COURT IN CONNECTION WITH THAT VARIANCE
23  MOTION, AND SO THOSE ARE A FEW OF THE MAJOR THINGS THAT ARE
24  FACING US RIGHT NOW.
25              THE COURT:  ALL RIGHT.  WELL, I'LL HEAR FROM THE
```

ANDRE G. ASHLEY, O.C.R.

1    DEFENDANT AS TO EXTENUATION AND MITIGATION.  THE DEFENDANT HAS

2    THE RIGHT TO ADDRESS THE COURT PERSONALLY WHICH HE MAY DO SO,

3    BUT HOWEVER YOU WISH TO PRESENT YOUR CASE, MR. BEVER, YOU ARE A

4    VERY ABLE LAWYER.

5            MR. BEVER:  THANK YOU.  I'D LIKE TO START WITH THE

6    DOWNWARD DEPARTURE WITH RESPECT TO THE CRIMINAL HISTORY, IF I

7    MAY?

8            THE COURT: GO AHEAD.  I'D REALLY LIKE TO HEAR FROM

9    HIS MOTHER AND HIS FAMILY.

10           MR. BEVER:  ALL RIGHT.  OKAY.  MS. THOOLEY.

11           THE COURT:  SPEAK INTO THE MICROPHONE PLEASE.

12           MR. BEVER:  MS. THOOLEY UNDERSTANDABLY IS A LITTLE

13   BIT NERVOUS THIS AFTERNOON, AND SO I'M JUST GOING TO LET HER

14   SPEAK, BUT THEN WHEN SHE FINISHES SPEAKING, I MAY ASK HER SOME

15   QUESTIONS OF WHAT WE'VE TALKED ABOUT IN ORDER TO BE ABLE TO

16   FACILITATE SO THE COURT CAN HEAR EVERYTHING FROM HER.

17           THE COURT:  THAT WILL BE FINE.

18           TELL ME YOUR FULL NAME?

19           MS. THOOLEY:  OKAY.  MY NAME IS KATRINA LEE THOOLEY,

20   AND, YOUR HONOR, I HAVE JUST COME TO ASK YOU TO HAVE MERCY ON

21   MY SON AND MY GRANDCHILDREN AND DAUGHTER-IN-LAW AND FOR HIS

22   FAMILY BECAUSE I KNOW I WAS NEVER A GOOD MOTHER NOT FOR A LONG

23   TIME, YOUR HONOR.

24           I WAS ADDICTED TO DRUGS.  MY SON'S SEEN ME BEAT.

25   HE'S SEEN ME OD.  IF I COULD DO ANYTHING TO CHANGE THOSE YEARS


                    ANDRE G. ASHLEY, O.C.R.

1 BEHIND ME, I WOULD SPARE MY CHILDREN.  I'VE BEEN NOW I'VE BEEN

2 CLEAN FOR YEARS.  I GO TO CHURCH.  I HAVE REMARRIED, AND I LOVE

3 MY CHILDREN VERY MUCH, BUT IT TOOK ME YEARS TO UNDERSTAND THIS,

4 YOUR HONOR.

5           WELL, MY COMMON LAW HUSBAND HE RAN OFF WITH ONE OF MY

6 SONS.  BEFORE HE RAN OFF, HE GOT ME ADDICTED TO DRUGS.  I WAS

7 ADDICTED TO COCAINE FOR MANY YEARS, MANY YEARS, YOUR HONOR.

8           I SENT MY CHILDREN AWAY, WHICH I DID NOT MEAN IT.  I

9 JUST WISH I COULD CHANGE THE YEARS BACK.  APOLLO'S SEEN ME

10 BEAT.  HE'S SEEN ME DIE IN FRONT OF HIM.  HE WAS PUSHED FROM

11 ONE HOUSE TO ANOTHER.

12           WHEN MY BOYFRIEND RAN OFF WITH MY MIDDLE SON, I

13 THOUGHT MY WORLD HAD ENDED.  I HAD NO WAY TO SUPPORT MY

14 CHILDREN.  I LET APOLLO GO LIVE WITH MY AUNT, AND MY MIDDLE SON

15 HIS FATHER RAN OFF WITH HIM.  I COULD NOT FIND HIM UNTIL HE WAS

16 18 YEARS OLD.  MY OTHER TWO CHILDREN WENT TO LIVE WITH MY

17 MOTHER.  I STAYED GONE FOR YEARS BECAUSE I WAS IN SO MUCH

18 PAIN.  I WISH I COULD CHANGE THOSE YEARS VERY MUCH, YOUR

19 HONOR.

20           MR. BEVER:  MS. THOOLEY, YOU WERE SAYING THAT YOUR

21 SON SAW YOU BEAT.  CAN YOU EXPLAIN TO THE COURT WHAT AGE HE WAS

22 DURING THAT PERIOD?

23           MS. THOOLEY:  HE WAS ABOUT FIVE YEARS OLD.  I WAS IN

24 A HOTEL ROOM WITH ONE OF MY EX-BOYFRIENDS, AND HE ALMOST KILLED

25 ME.  HE BEAT ME IN MY HEAD.  HE BEAT ME IN MY FACE, IN MY

ANDRE G. ASHLEY, O.C.R.

1  CHEST, ALL OVER.  APOLLO SEEN THIS.

2          HE WENT FROM SCHOOL TO SCHOOL, IN AND OUT OF SCHOOL

3  DURING THESE YEARS.  HE HAD NO, NO MALE FIGURE IN HIS LIFE.

4  THE ONE HE DID HAVE DIDN'T WANT ANYTHING TO DO WITH HIM.  HE

5  WAS JEALOUS OF HIM.

6          MR. BEVER:  AND, MS. THOOLEY, YOU HAD INDICATED ABOUT

7  YOUR SON SEEING YOU OR BEING AWARE OF YOUR OVERDOSING ON

8  DRUGS.  CAN YOU EXPLAIN TO THE COURT WHAT AGE HE WOULD HAVE

9  BEEN AND WHAT HE WOULD HAVE SEEN?

10          MS. THOOLEY:  HE WAS ABOUT NINE YEARS OLD, AND MY

11  GIRLFRIEND AND MY BOYFRIEND PULLED ME OUT OF THE BATHROOM, AND

12  THEY COULDN'T GET ME TO BREATHE.  HE KNEW I WAS DOING SOME KIND

13  OF DRUGS.  HE'S SEEN THIS WITH HIS OWN EYES.  HE'S SEEN THEM

14  HAVE TO GIVE ME MOUTH-TO-MOUTH RESUSCITATION TO BRING ME BACK.

15          MR. BEVER:  AND AT THAT TIME YOU WERE THE ONLY PARENT

16  WHO WAS THERE WHEN HE WAS SEEING YOU OVERDOSE?

17          MS. THOOLEY:  YES, SIR, I'M THE ONLY PARENT HE'S EVER

18  HAD, AND I WASN'T A GOOD ONE.

19          MR. BEVER:  WHO ALL ELSE DID HE LIVE WITH WHEN HE

20  WASN'T WITH YOU?

21          MS. THOOLEY:  HE LIVED WITH SOME FRIENDS OF MINE.  HE

22  LIVED WITH MY MOTHER AND MY AUNT.

23          MR. BEVER:  THOSE WERE ON SEPARATE OCCASIONS?

24          MS. THOOLEY:  YES, SEPARATE OCCASIONS.

25          MR. BEVER:  DO YOU KNOW HOW OLD HE WAS BEFORE HE EVER


                          ANDRE G. ASHLEY, O.C.R.

1   WENT TO ELEMENTARY SCHOOL?

2          MS. THOOLEY:  HE DIDN'T START KINDERGARTEN UNTIL HE

3   WAS ABOUT SIX, AND THEN HE WAS IN AND OUT OF SCHOOL UNTIL HE

4   WAS ABOUT IN THE THIRD GRADE OFF AND ON.

5          MR. BEVER:  AND WERE THERE TIMES WHEN EVEN THOUGH HE

6   WAS BEING RAISED BY YOUR DIFFERENT FAMILY MEMBERS OR FRIENDS

7   THAT HE WAS STILL -- THAT HE WOULD SEE YOU FROM TIME TO TIME?

8          MS. THOOLEY:  NO.

9          MR. BEVER:  AND WERE THERE -- WERE THERE TIMES

10  WHEN -- WELL, WHEN DID YOU RECONNECT WITH YOUR SON?

11         MS. THOOLEY:  WELL ONE TIME WHEN HE WAS ABOUT 18, 17

12  OR 18, AND THEN IT WENT FOR YEARS AGAIN UNTIL ABOUT SIX YEARS

13  AGO.

14         MR. BEVER:  OKAY.  IF I MAY HAVE A MOMENT, YOUR

15  HONOR?

16         (PAUSE IN THE PROCEEDINGS.)

17         MR. BEVER:  YOUR HONOR, UNLESS THERE IS ANYTHING ELSE

18  THAT MS. THOOLEY WOULD LIKE TO ADDRESS TO THE COURT, I THINK

19  THAT'S THE MAIN THING THAT I WANTED TO HAVE HER BRING TO THE

20  COURT'S ATTENTION.

21         THE COURT:  ALL RIGHT.  THANK YOU, MA'AM.

22         MS. THOOLEY:  THANK YOU.

23         MR. BEVER:  I WOULD NOW LIKE TO CALL MR. NIDA'S

24  BROTHER MICHAEL DERRICK AND ASK HIM TO ADDRESS THE COURT IN A

25  SIMILAR WAY, ALTHOUGH HE MAY NOT BE QUITE AS NERVOUS AS HIS


                    ANDRE G. ASHLEY, O.C.R.

1  MOM.  THERE MAY BE SOME THINGS SINCE HE'S SPEAKING

2  EXTEMPORANEOUSLY THAT I MAY WANT TO ASK HIM IN TERMS OF

3  FOLLOW-UP.

4          THE COURT:  THAT WILL BE FINE.  TELL ME YOUR FULL

5  NAME.

6          MR. DERRICK:  MICHAEL ANTHONY DERRICK.

7          THE COURT:  TELL ME WHAT'S ON YOUR HEART.

8          MR. DERRICK:  HELLO, YOUR HONOR, JUDGE PANNELL,

9  MEMBERS OF THE COURT, I'M HERE TO ATTEST TO THE CHARACTER OF MY

10  BROTHER APOLLO NIDA, AND PERHAPS BE A VOICE OF LENIENCY FOR HIS

11  CHILDREN WHO AREN'T HERE AYDEN WHO IS FOUR AND DYLAN WHO IS

12  ONE, BOTH LAST NIDA, AND JUST SHED SOME LIGHT AS TO THE

13  CHARACTER THAT I KNOW THAT HE IS AND HE POSSESSES AND PERHAPS

14  ONE DAY HE COULD RETURN TO SOCIETY AND BE A PRODUCTIVE

15  CITIZEN.

16          THE COURT:  ALL RIGHT.  THANK YOU.  LET'S SEE IF MR.

17  BEVER HAS SOME QUESTIONS.

18          MR. BEVER:  DID YOU GROW UP IN THE SAME HOUSEHOLD

19  WITH YOUR BROTHER APOLLO?

20          MR. DERRICK:  NO, I HAVE A TWIN BROTHER.  WE GREW

21  UP -- AS MY MOTHER STATED, THE FAMILY WAS SPLIT APART.  WE WERE

22  RAISED BY OUR MATERNAL GRANDMOTHER.

23          MR. BEVER:  IN CONTRAST TO APOLLO, DID YOU END UP

24  GRADUATING FROM HIGH SCHOOL?

25          MR. DERRICK:  YES.


                    ANDRE G. ASHLEY, O.C.R.

1          MR. BEVER:  AND DID YOU END UP GOING TO COLLEGE?

2          MR. DERRICK:  YES.

3          MR. BEVER:  AND WHAT COLLEGE DID YOU GO TO.

4          MR. DERRICK:  GEORGIA STATE UNIVERSITY.

5          MR. BEVER:  AND YOU HAVE A TWIN BROTHER YOU SAID?

6          MR. DERRICK:  YES.

7          MR. BEVER:  DID HE GO TO COLLEGE?

8          MR. DERRICK:  YES.

9          MR. BEVER:  AND WHERE DID HE GO?

10         MR. DERRICK:  GEORGIA STATE UNIVERSITY.

11         MR. BEVER:  AND FROM YOUR EXPERIENCE -- WELL, YOU'VE

12 RECONNECTED WITH YOUR BROTHER WHERE?

13         MR. DERRICK:  WELL, WE HAD ONLY SEEN HIM MAYBE FIVE

14 TIMES AT MOST THROUGH OUR LIFE, AND WE RECONNECTED TO HIM WHILE

15 HE WAS IN PRISON DURING HIS FIRST INCARCERATION IN THE STATE OF

16 GEORGIA.

17         MR. BEVER:  SO YOU WILL GO VISIT HIM IN PRISON?

18         MR. DERRICK:  YES, WE ESTABLISHED A RELATIONSHIP

19 FIRST THROUGH MAIL AND CONVERSATIONS AND VISITING HIM, YOU

20 KNOW, I REALLY GOT TO SEE MY BROTHER AS PART OF MY LIFE NOW,

21 YOU KNOW, I GOT TO SEE THE GUY THAT HE REALLY IS, THE WISDOM HE

22 HAS, AND I DECIDED IT WOULD BE BEST TO GO AHEAD AND PURSUE A

23 RELATIONSHIP GETTING TO KNOW MY BROTHER.

24         MR. BEVER:  WHAT DID HE TELL YOU ABOUT YOURSELF IN

25 TERMS OF YOUR LIFE WHEN YOU WERE ON THIS COLLEGE TREK OF WHAT


                    ANDRE G. ASHLEY, O.C.R.

1  YOU SHOULD DO?

2          MR. DERRICK:  WELL, HE WAS -- WE DIDN'T HAVE A GOOD

3  HOUSEHOLD EITHER LIVING WITH MY GRANDPARENTS, BUT HE WAS ONE OF

4  THE MAIN REASONS I STUCK IT OUT AND GRADUATED HIGH SCHOOL AND

5  PURSUED COLLEGE.  HE WAS VERY PROUD OF US FOR ATTEMPTING THAT.

6          HE ALWAYS PURSUED ASPIRATIONS.  HE KNEW I HAD AN

7  INTEREST IN REAL ESTATE AND MARKETING AND BUSINESS, AND HE

8  ALWAYS WOULD TELL US, YOU KNOW, PURSUE COLLEGE, PURSUE YOUR

9  DREAMS, YOU KNOW, BE BETTER THAN ME, DON'T DO AS I DO.

10          MR. BEVER:  AND AM I CORRECT IN TERMS OF AGE WISE

11  HE'S AROUND 35 OR SO AND YOU'RE ABOUT --

12          MR. DERRICK:  26, YEAH.

13          MR. BEVER:  FOR THE COURT, WHAT WOULD YOU SAY IS THE

14  MAIN DIFFERENCE BETWEEN YOUR UPBRINGING THAT MADE YOU AND YOUR

15  BROTHER DIFFERENT THAN THE UPBRINGING OF APOLLO?

16          MR. DERRICK:  I WOULD SAY STRUCTURE.  ALTHOUGH BE IT

17  LIMITED, MY MATERNAL GRANDMOTHER TRIED TO PROVIDE FOR ME AND MY

18  TWIN BROTHER.  WE DID HAVE A FATHER FIGURE IN OUR LIFE WHICH

19  WAS HER -- WELL, THEY WERE NEVER MARRIED BUT STEPHUSBAND, I

20  DON'T KNOW THE WORD FOR IT, BUT THEY WERE TOGETHER 20 PLUS

21  YEARS AND RAISED US FROM SIX MONTHS OLD AND ALWAYS MADE SURE

22  THAT WE WERE ON THE HONOR ROLE IN SCHOOL, SCHOOL PROGRAMS,

23  SPORTS, BASEBALL, MUSIC.

24          WE JUST HAD STRUCTURE, AND I DON'T THINK APOLLO HAD

25  THAT UNTIL THE LATTER PART MAYBE 16 AND 17 AND MAYBE, YOU KNOW,


                    ANDRE G. ASHLEY, O.C.R.

1   QUOTE, UNQUOTE, THE DAMAGE HAD ALREADY BEEN DONE HIM LIVING ON

2   THE STREET.  I MEAN I DON'T WANT TO DO HEARSAY, BUT I USED TO

3   HEAR STORIES FROM MY GRANDMOTHER THAT APOLLO IS BY HIMSELF,

4   LIKE HAVING TO SWEEP PARKING LOTS FOR MONEY BECAUSE MY MOTHER

5   WAS PREGNANT AND HE'D HAVE TO FEND FOR HIMSELF, AND HE'D BOUNCE

6   AROUND HOME TO HOME AND, YOU KNOW, LIVING ON THE STREET AND

7   LIVING WITH HER FRIENDS OR WHOMEVER, I'M NOT SURE, I WASN'T

8   THERE.

9          AND WE WERE ABANDONED, AND HE HAD TO TAKE ME AND MY

10  BROTHER TO OUR GRANDMOTHER'S WHEN HE WAS PROBABLY LIKE 7 AND 8,

11  AND WE WERE INFANTS.  SO I CAN SAY, YOU KNOW, HE HAS A HEART.

12  HE'S ALWAYS BEEN GOOD TO HIS CHILDREN.  THE MAN I SEE, YOU

13  KNOW, HE'S ALWAYS FROM MY POINT OF VIEW, YOU KNOW, HAD A BAD

14  UPBRINGING, AND I DON'T KNOW.

15          MR. BEVER:  ONE FINAL QUESTION WHICH IS WHEN YOU WERE

16  LIVING WITH YOUR GRANDPARENTS DID THEY ESTABLISH ANY RULES FOR

17  YOU TO LIVE BY AS YOU WERE GROWING UP?

18          MR. DERRICK:  YEAH.  WELL, I CALL HIM MY DAD, BUT,

19  YOU KNOW, GRANDFATHER, WHATEVER FOR OUR PURPOSES, HE ALWAYS

20  INSTILLED VALUES IN US, YOU KNOW, IF WE DID SOMETHING WRONG, WE

21  WOULD BE DISCIPLINED ACCORDINGLY, YOU KNOW, WE HAD STRUCTURE,

22  AND I CAN'T SAY APOLLO HAD THAT, OR EVEN HAD A FATHER FIGURE

23  OTHER THAN MAYBE SPORTS COACHES OR WHATEVER YOUTH PROGRAMS

24  HE WAS ABLE TO GET IN RIGHT BEFORE HE DROPPED OUT OF HIGH

25  SCHOOL.


                    ANDRE G. ASHLEY, O.C.R.

1        MR. BEVER:  OKAY.

2        MR. DERRICK:  I JUST WANT YOU TO KNOW THAT THE APOLLO

3  I KNOW HE'S NOT A VILLAIN.  HE'S NOT, YOU KNOW, HE'S A HUMAN

4  BEING.  HE HAS A HEART, AND I JUST WANT TO PUT THAT OUT THERE.

5        THE COURT:  THANK YOU VERY MUCH.

6        MR. DERRICK:  THANK YOU.

7        MR. BEVER:  YOUR HONOR, I CAN ADDRESS THE MOTION FOR

8  VARIANCE IN TERMS OF POOR UPBRINGING WHICH MAY BE APPROPRIATE

9  AT THIS TIME, OR I CAN MOVE TO THE CRIMINAL HISTORY CATEGORY,

10 EITHER ONE.

11        THE COURT:  GO AHEAD AND DO BOTH.  THAT WILL BE FINE.

12        MR. BEVER:  YOUR HONOR, I'M GOING TO START SINCE

13 WE'VE JUST HAD THE SPEAKING BOTH BY THE DEFENDANT'S MOTHER AND

14 BROTHER THAT I'M GOING TO START ON THE VARIANCE FOR THE BAD

15 UPBRINGING.

16        THIS IS A VARIANCE WHICH HAS BEEN GRANTED BY COURTS

17 IN THE PAST, AND SOMETIMES LARGE VARIANCES HAVE BEEN GIVEN AS A

18 RESULT OF THIS.  WE HAVE CITED A NUMBER IN OUR BRIEF, BUT WHAT

19 STRUCK ME WAS WHEN I LOOKED THIS MORNING IN PREPARATION FOR THE

20 HEARING, THE AMOUNT OF THE REDUCTIONS.

21        IN THE CASE OF UNITED STATES VERSUS MAPP OUT OF THE

22 EASTERN DISTRICT OF MICHIGAN, IT WAS A 65 PERCENT REDUCTION FOR

23 BAD UPBRINGING.  IN THE EASTERN DISTRICT OF VIRGINIA CASE, THE

24 HUNT CASE, IT WAS A 50 PERCENT REDUCTION.  IN THE PATSER CASE

25 COMING FROM THE NORTHERN DISTRICT OF ILLINOIS, THERE WAS A 55


ANDRE G. ASHLEY, O.C.R.

1  PERCENT REDUCTION.  IN THE SOUTHERN DISTRICT NEW YORK CASE OF

2  RUIZ IT WAS ROUGHLY A 30 PERCENT REDUCTION.  IN THE EASTERN

3  DISTRICT OF NEW YORK CASE OF HAMBY, IT WAS A 20 PERCENT

4  REDUCTION, AND THIS IS ASIDE AND APART FROM OTHER REDUCTIONS.

5  THIS IS FOR BAD UPBRINGING.

6         THERE IS A RECOGNITION BY THE DISTRICT COURTS THAT IF

7  YOU'RE SOMEONE LIKE APOLLO NIDA AS OPPOSED TO SOMEONE LIKE TOM

8  BEVER, WHO HAD THE OPPORTUNITY TO BE BROUGHT UP IN A GOOD HOME,

9  THE CALCULATION OUGHT TO BE A LITTLE BIT DIFFERENT, BECAUSE I

10  HAVE OPTIONS AND HAVE HAD OPTIONS, AND MY CLIENT HAS NOT HAD

11  THOSE SAME OPTIONS.

12         I TOOK A LOOK AT SOME STUDIES THAT HAD BEEN DONE THAT

13  WERE FASCINATING AND DISTURBING AT THE SAME TIME.  THERE IS A

14  BROOKINGS INSTITUTION CALLED THE HAMILTON PROJECT STUDY THAT

15  CAME OUT IN MAY OF 2014 THAT REFLECTS THAT BLACK MALE DROPOUTS

16  THAT WERE BORN IN OR AROUND 1975 LIKE MR. NIDA HAVE A 70

17  PERCENT CHANCE OF ENDING UP IN PRISON.

18         THERE IS A STUDY WHICH WAS DONE ON -- LET'S SEE,

19  REPORTED BY THE TAVIS SMILEY REPORTS THAT IS EQUALLY SHOCKING

20  WHICH IS THAT 60 PERCENT OF BLACK STUDENTS WHO DROP OUT OF HIGH

21  SCHOOL SPENT TIME IN PRISON.

22         MR. NIDA UNFORTUNATELY DID DROP OUT OF HIGH SCHOOL.

23  HE ULTIMATELY GOT HIS G.E.D., BUT, INDEED, HE FALLS IN THAT

24  PERCENTAGE OF THE MAJORITY OF BLACK MALES WHO END UP THERE IF

25  THEY DON'T STAY IN SCHOOL.


                    ANDRE G. ASHLEY, O.C.R.

1           THERE WAS A SCHOTT FOUNDATION STUDY IN SEPTEMBER OF

2    2012 WHICH WAS SIMILAR THAT 52 PERCENT OF BLACK MALES WHO DO

3    NOT GRADUATE FROM HIGH SCHOOL END UP IN PRISON, AND

4    INTERESTINGLY IN THAT THERE'S ALSO A PART OF THE STUDY WHICH

5    REFLECTS THAT ONE CAN ALMOST CONCLUDE WHETHER OR NOT A CHILD

6    WILL GO TO PRISON WHO'S AN AFRICAN-AMERICAN MALE AT SOME POINT

7    IF THEIR LITERARY SCORE IS LOW, AND THEY END UP ESSENTIALLY NOT

8    DOING WELL AS EARLY AS ELEMENTARY SCHOOL, AND AS THE COURT

9    HEARD, MR. NIDA WAS IN AND OUT OF ELEMENTARY SCHOOL WHEN HE WAS

10   A YOUNG MAN.  SO HE HAD, IF YOU WILL, A COUPLE OF STRIKES

11   AGAINST HIM IN TERMS OF BOTH NOT FINISHING HIGH SCHOOL AND ALSO

12   NOT BEING CONSISTENTLY IN SCHOOL.

13           MY CLIENT HAD EXACTLY THE KIND OF AWFUL UPBRINGING

14   THAT THE OTHER DISTRICT COURTS HAVE FOUND REASON TO GRANT

15   VARIANCES.  AS THE COURT HEARD, HE DID NOT HAVE ANY KIND OF

16   FATHER FIGURE WHATSOEVER.  HE DID NOT HAVE A MOTHER FIGURE.

17   YOUR HONOR, UNLIKE YOURSELF AND I KNOW AT LEAST YOUR SON AND ME

18   AND MY SON AND BEING ABLE TO PARTICIPATE IN SCOUTS, HERE THERE

19   WAS NO ONE WHO WAS SETTING MR. NIDA'S MORAL COMPASS NORTH.

20   THERE WAS NO ONE SETTING DOWN RULES FOR THE MAN.  IT DOES NOT

21   CONDONE THE CONDUCT, BUT IT EXPLAINS THE CONDUCT, AND THAT'S

22   THE REASON FOR THE VARIANCE.

23           HE IS ALSO THE ONLY INDIVIDUAL WITHIN HIS FAMILY OF

24   MIXED RACE.  IT IS NOT EASY GROWING UP A GENERATION AGO BEING A

25   SCHOOL KID AND BEING IN THAT SITUATION.  THAT'S NOT EASY TO

1   GROW UP UNDER ANY SCENARIO.  HE WAS LITERALLY RAISED ON THE

2   STREETS BEING PASSED BETWEEN FRIENDS AND FAMILY MEMBERS AND

3   GOING FROM PLACE TO PLACE.  HE HAD NO ROCK.

4        HE WAS PRESENT WHEN HIS MOTHER, AS SHE DESCRIBED,

5   ENGAGED IN INAPPROPRIATE CONDUCT, AND HE WAS PRESENT WHEN HE

6   SAW HER BEAT WITHIN AN INCH OF HER LIFE, AND WHEN YOU SEE THAT

7   AT AGE FIVE OR NINE, YOU END UP WITH VIDEOTAPES IN YOUR HEAD

8   THAT HAVE AN INFLUENCE IN TERMS OF WHAT YOU DO LATER ON IN

9   LIFE.

10       IT IS AMAZING TO ME IN A WAY THAT MR. NIDA HAS

11  ENGAGED IN WHITE COLLAR OFFENSES OR FRAUD AS OPPOSED TO DRUG

12  OFFENSES WHICH WOULD BE MUCH MORE COMMON OR VIOLENT OFFENSES

13  WHICH WOULD BE MUCH MORE COMMON.

14       THERE ARE YOUNG MEN WHO DON'T HAVE HALF AS BAD AN

15  UPBRINGING AS HE HAD WHO END UP BEING UP FOR MURDER AND THE

16  LIKE ON MORE THAN ONE OCCASION, AND YOUR HONOR IS AWARE OF THAT

17  FROM YOUR OWN BACKGROUND AS A DISTRICT ATTORNEY AND AS A

18  SUPERIOR COURT JUDGE, AND EVEN DESPITE THAT, THERE ARE AS THE

19  LETTERS WHICH WE'VE OVERNIGHTED TO YOUR HONOR LAST NIGHT THAT I

20  HOPE THE COURT SAW TODAY AND HAD THE OPPORTUNITY TO LOOK AT IN

21  ADDITION TO HIS TESTIMONY FROM HIS BROTHER IS THAT THERE ARE

22  PEOPLE WHO STILL FIND HIM TO BE, YOU KNOW, A GOOD PERSON EVEN

23  THOUGH HE HAS ENGAGED IN CRIMINAL CONDUCT, A LOYAL FRIEND,

24  SOMEONE WHOM THEY LIKE TO BE WITH, SOMEONE WHO THEY FIND CAN BE

25  UPLIFTING, WHO TALKS TO PEOPLE ON THE STREET, WHO CAN BE

1  HELPFUL TO OTHER PEOPLE, WHO LOVES HIS OWN CHILDREN, CAN BE

2  KIND TO OTHER CHILDREN, AND ESPECIALLY UNDERSTANDS THE PLIGHT

3  OF SINGLE MOTHER'S AND WHO ENJOYS BEING NICE TO THEIR

4  CHILDREN.

5          HE HAD NOTHING WHERE ONE'S MORALS IN LIFE ARE

6  ESTABLISHED.  HE IS A SURVIVOR OF LIVING ON THE STREETS, AND

7  IT'S SOMEWHAT SURPRISING THAT HE DOESN'T HARBOR GREATER

8  RESENTMENT OR ANGER OR WHATEVER THE CASE MAY BE OR BLAME

9  TOWARDS HIS UPBRINGING.

10          I AM THE ONE WHO ASKED FOR HIS MOTHER TO BE PRESENT

11  HERE TODAY.  I AM THE ONE WHO ASKED FOR HIS BROTHER TO BE

12  PRESENT HERE TODAY, AND IN TERMS OF THIS VARIANCE AS A SOCIETY

13  AND HERE FOR THE COURT, I GUESS MY QUESTION WOULD BE RHETORICAL

14  WHICH IS HOW COULD WE EXPECT HIM TO COME OUT ANY DIFFERENTLY,

15  AND I'M NOT CONDONING THE CONDUCT.

16          BUT IT'S THE BASIS FOR IF WE'RE SEEKING UNDER THE

17  FEDERAL SENTENCING GUIDELINES AND THE OVERALL SENTENCING SCHEME

18  FOR A SENTENCE WHICH IS SUFFICIENT BUT NOT MORE THAN IS

19  NECESSARY IN A SITUATION WHERE HE'S HAD THIS KIND OF

20  UPBRINGING, I WOULD ARGUE THAT A VARIANCE FOR THIS BAD

21  UPBRINGING WOULD BE APPROPRIATE.

22          YOUR HONOR, IF I MAY NOW, I'D LIKE TO TURN TO MY

23  DOWNWARD DEPARTURE IN TERMS OF HIS CRIMINAL HISTORY CATEGORY?

24          THE COURT:  GO AHEAD.

25          MR. BEVER:  YOUR HONOR, WE DID FILE A MOTION AND

ANDRE G. ASHLEY, O.C.R.

1   BRIEF ON THIS TOPIC, AND I'M CERTAINLY NOT GOING TO GO OVER

2   THAT.  I KNOW THAT THE COURT HAS READ IT, BUT WHAT IS STRIKING

3   TO ME WHEN I LOOKED AT THE PRESENTENCE REPORT AND THE MOTION IS

4   STYLED DEFENDANT APOLLO NIDA'S MOTION FOR DOWNWARD DEPARTURE

5   AND SPECIFICALLY ON THE CRIMINAL HISTORY CATEGORY IS THAT MOST

6   OF HIS POINTS THAT HE RECEIVED WERE WHEN HE WAS YOUNG AS IN 18

7   OR 23, AND THEY SEEM TO STACK UP IN TERMS OF AN INITIAL CAR

8   THEFT THAT I DESCRIBED PREVIOUSLY, AND THEN ONE SIX MONTHS

9   LATER, PROBATION REVOCATIONS WHEN HE'S 19 OR 23, A DUI WHEN HE

10  WAS 23.

11          UNFORTUNATELY LIKE MANY MEN OR YOUNG MEN WHEN THEY

12  GET CAUGHT FOR SOMETHING, GIVING A FALSE NAME AND THEN TRYING

13  TO RUN AWAY, THAT'S NOT NEW TO THE COURT OR TO THE NATURE OF

14  PEOPLE WHEN THEY GET IN TROUBLE ALSO WHEN HE WAS 23 YEARS OLD,

15  AND I'M NOT LOOKING TO MAKE LIGHT OF THOSE OFFENSES.  THEFT IS

16  A THEFT, AND PROBATION REVOCATION IS A REVOCATION, AND GIVING A

17  FALSE NAME IS WRONG AND RUNNING AWAY IS WRONG, BUT CATEGORY

18  FIVE IS WAY UP THERE.

19          I'VE NEVER HAD A CLIENT WHO'S BEEN IN A CATEGORY

20  FIVE.  CATEGORY FIVE IS RESERVED, IT WOULD SEEM TO ME, FOR

21  OFFENDERS WHO HAVE A MUCH MORE SERIOUS CRIMINAL BACKGROUND THAN

22  MR. NIDA DOES.  I DON'T MEAN TO SAY THAT THESE ARE MINOR

23  OFFENSES.  THEY ARE NOT, BUT I DO MEAN TO SAY THAT RELATIVE TO

24  WHAT THIS COURT SEES DAY IN AND DAY OUT HERE IN TERMS OF HIS

25  PAST CRIMINAL HISTORY CATEGORY AND WHAT YOU HAVE, OF COURSE,

ANDRE G. ASHLEY, O.C.R.

1  SEEN ON THE SUPERIOR COURT AND IN PROSECUTING AS A DA, THAT

2  THESE ARE -- THIS OVERSTATES THE SERIOUSNESS OF MR. NIDA'S

3  CRIMINAL HISTORY CATEGORY, AND AS A RESULT REALLY JACKS UP HIS

4  GUIDELINES NUMBERS.

5          SO WE THINK THAT THE -- MY VIEW IS THAT THERE SHOULD

6  BE A DOWNWARD DEPARTURE BASED UPON THIS OVERSTATING THE

7  SERIOUSNESS OF THE OFFENSE.

8          THE COURT:  ALL RIGHT.  LET ME SEE IF MS. BLACK

9  AGREES WITH YOU.  YOU ALWAYS DO A VERY NICE JOB FOR YOUR

10  CLIENT.

11          MR. BEVER:  THANK YOU, YOUR HONOR.

12          MS. BLACK:  YOUR HONOR, THE GOVERNMENT DOESN'T

13  BELIEVE THAT EITHER VARIANCE IS APPROPRIATE.  THE GOVERNMENT'S

14  POSITION IS THAT THE GUIDELINES DO TAKE INTO ACCOUNT ALL THE

15  RELEVANT FACTORS IN THIS CASE.  I'LL ADDRESS FIRST THE ISSUE OF

16  MR. NIDA'S UPBRINGING.

17          WITHOUT TAKING AWAY FROM THE INFORMATION THAT WAS

18  PRESENTED HERE TODAY ABOUT THOSE VERY DIFFICULT CIRCUMSTANCES,

19  THIS COURT IS AWARE THAT ALMOST EVERYONE WHO PASSES THROUGH THE

20  FEDERAL CRIMINAL JUSTICE SYSTEM HAS HAD SOME SORT OF HARDSHIP

21  IN LIFE.  THE SYSTEM DOES NOT CUT EQUALLY THROUGH ALL SEGMENTS

22  OF SOCIETY.  NO CRIMINAL JUSTICE SYSTEM DOES.

23          MANY, MANY OFFENDERS HAVE HAD VERY DIFFICULT

24  BACKGROUNDS, AND AT SOME POINT AS PEOPLE GROW OLDER, AS THEY

25  HAVE SECOND CHANCES, AS THEY HAVE STRUCTURE ADDED TO THEIR

ANDRE G. ASHLEY, O.C.R.

1    LIVES, THERE COMES A TIME WHEN IT'S NECESSARY TO HOLD FOLKS

2    FULLY RESPONSIBLE FOR THEIR OWN ACTIONS.

3         AND I WANT TO ADDRESS THE COURT'S ATTENTION TO A

4    PARTICULAR CHOICE POINT OR KEY POINT IN MR. NIDA'S PERSONAL

5    HISTORY, AND THAT IS THE OPPORTUNITY THAT HE HAD WHEN HE WAS

6    PAROLED AFTER SERVING ONLY SIX YEARS OF AN 18-YEAR SENTENCE FOR

7    HIS GEORGIA RICO VIOLATION, AND MR. NIDA WAS PAROLED IN 2009.

8         IT WAS REALLY A SECOND CHANCE AT LIFE.  HE HAD 12

9    YEARS REMAINING ON HIS SENTENCE.  HE WAS OVER 30 AT THE TIME

10   THAT HE WAS PAROLED, AND HE HAD SIX YEARS OF INCARCERATION UPON

11   WHICH TO REFLECT ON HIS -- THE FIRST 30 YEARS OF HIS LIFE, ON

12   HIS EARLY CRIMINAL HISTORY AND ON ALL THE CHOICES THAT HE'S

13   MADE.

14        ALMOST IMMEDIATELY UPON HIS RELEASE FROM PRISON, HE

15   MARRIED MS. BAKER-PARKS WHO IS LISTED IN THE PSR.  SHE HAD

16   REPRESENTED HIM IN A PREVIOUS MATTER, AND AS SHE EXPLAINED TO

17   THE COURT DURING HIS GUILTY PLEA COLLOQUY, MR. NIDA DID NOT

18   EXPERIENCE ANY FINANCIAL NEED AFTER MARRYING MS. PARKS.  HER

19   INCOME PROVIDED FOR THE NEEDS OF THE FAMILY.  HE ALSO SHORTLY

20   AFTER HIS PAROLE IN 2009, NOW A 30-YEAR-OLD MAN MARRIED TO A

21   PRACTICING LAWYER, HE ALSO HAD THE OPPORTUNITY TO APPEAR ON A

22   TV SHOW SHORTLY THEREAFTER WHICH HE TOOK.

23        SO I CAN'T -- I SIMPLY CAN'T ADDRESS OR TAKE ANYTHING

24   AWAY FROM THOSE ISSUES OF EARLY LIFE, BUT THIS MAN HAD A HUGE

25   SECOND CHANCE AT AGE 30, AND ON WHAT'S BEEN PRESENTED AS A

1  STABLE ENVIRONMENT WITH NO FINANCIAL NEED AND REALLY HE'S ON

2  ESSENTIALLY BORROWED TIME FROM THAT PAROLE.

3          HAD THAT PAROLE NOT HAPPENED, HE STILL WOULD BE

4  INCARCERATED AND WOULD HAVE BEEN UNTIL 2021.  THE PAROLE WAS

5  ACTUALLY COMMUTED AS THE PSR REFLECTS IN 2012, AND BY THAT TIME

6  HE WAS DEEP INTO THE MASSIVE SCHEME THAT BROUGHT US HERE

7  TODAY.

8          SO HE GOT OUT.  HE HAD A SECOND CHANCE.  HE HAD

9  STRUCTURE.  HE HAD NO FINANCIAL NEED, AND HE CHOSE TO RESUME

10 HIS PREVIOUS ACTIVITIES ON A LARGER, MORE SOPHISTICATED,

11 MASSIVE SCALE.  THAT'S A CHOICE.  AND IF THE COURT IS TO GIVE

12 HIM A VARIANCE AGAIN AND AGAIN BECAUSE OF THESE EARLY LIFE

13 CIRCUMSTANCES, HOW THEN CAN THE PUBLIC BE PROTECTED AGAINST

14 FUTURE VIOLATIONS.  WHAT LENGTH OF SENTENCE WOULD BE REQUIRED

15 IF THE SIX YEARS THAT HE WAS LEFT WITH AFTER THE PAROLE BEFORE

16 WASN'T ENOUGH, AND SO THAT'S WHAT I HAVE TO SAY ABOUT THAT.

17         ON THE ISSUE OF THE CRIMINAL HISTORY VARIANCE, SOME

18 OF THE SAME FACTORS APPLY.  MR. BEVER TALKS ABOUT THESE CAR

19 THEFTS AND THESE YOUTHFUL VIOLATIONS AS IF THERE WERE A STRETCH

20 OF CLEAN LIVING AFTERWARD, BUT THE PROBLEM WITH THAT ARGUMENT

21 IS THAT MR. NIDA BEGAN HIS SIX-YEAR TERM OF STATE INCARCERATION

22 SHORTLY AFTER THOSE OFFENSES.  HE WENT TO A JURY TRIAL.  HE WAS

23 GIVEN A 18YEAR SENTENCE FOR RICO.

24         SO HE WAS INCARCERATED BETWEEN 2003 AND 2009.  THAT'S

25 WHY HE DIDN'T HAVE ANY MORE OFFENSES IT SEEMS, AND THIS MASSIVE

1  SCHEME WAS COMMENCED ALMOST IMMEDIATELY UPON HIS RELEASE.

2          WE DON'T HAVE A SERIES OF SMALLER CONVICTIONS BETWEEN

3  2009 AND THE PRESENT, BUT YOUR HONOR RECALLS THE GUILTY PLEA

4  COLLOQUY AND THE TEXT OF THE CRIMINAL INFORMATION IN THIS CASE,

5  AND THIS CASE ALONE IN ITS SCOPE AND ITS MAGNITUDE IS REALLY

6  SEVERAL CASES THAT HAVE BEEN MADE INTO ONE FACTUALLY.

7          IF YOU LOOK AT THE DIFFERENT ENTITIES THAT WERE

8  VICTIMIZED BY MR. NIDA'S SCHEME, ELEVEN STATES, TWO DIFFERENT

9  AGENCIES OF THE FEDERAL GOVERNMENT IN TERMS OF THE FRAUDULENT

10  CLAIMS, NUMEROUS BANKS IN TERMS OF THE BANK FRAUD, MANY, MANY,

11  INDIVIDUAL VICTIMS IN TERMS OF THE IDENTITY THEFT, AND THE

12  DAMAGE TO THOSE FOLKS PUTTING THEIR LIVES BACK TOGETHER, IT

13  COULD WELL HAVE BEEN THAT THOSE THINGS WOULD HAVE BEEN HANDLED

14  BIT BY BIT AS THEFTS BY TAKING OR AS IMPERSONATION BY THE STATE

15  COURTS.  THEY WEREN'T.  IN FACT, HE WAS GETTING AWAY WITH IT,

16  AND IT WAS GETTING BIGGER AND BIGGER UNTIL IT BROUGHT US HERE

17  TODAY.

18          SO HIS CRIMINAL HISTORY DOES NOT OVERSTATE ANYTHING.

19  IT JUST A STRAIGHT FORWARD APPLICATION OF THE SENTENCING

20  GUIDELINES THAT LEADS TO A HIGH NUMBER BECAUSE THERE'S A LOT OF

21  CRIMINAL HISTORY.

22          MR. BEVER:  YOUR HONOR, IF I MAY HAVE A BRIEF

23  REBUTTAL.

24          THE COURT:  BRIEF.

25          MR. BEVER:  UNDER THE FEDERAL GUIDELINES -- UNDER THE


ANDRE G. ASHLEY, O.C.R.

1   FEDERAL SENTENCING SCHEME IF THE GUIDELINES IN AND OF

2   THEMSELVES WERE SUFFICIENT, WE'D BE UNDER THE OLD DAYS PRIOR TO

3   THE TIME THAT THE GUIDELINES BECAME ADVISORY.

4          CONGRESS IN ESTABLISHING WHAT I BELIEVE IS SECTION

5   3553(A) WHERE IT SPECIFIES THAT THE COURT IS TO TAKE INTO THE

6   HISTORY AND CHARACTERISTICS OF THE DEFENDANT DID SO WITH WISDOM

7   THAT DEFENDANTS ARE NOT ALL ALIKE, AND THAT IS THE REASON WHY

8   OTHER COURTS HAVE DONE A VARIANCE BASED UPON POOR UPBRINGING

9   AND THE SAME REASON THAT WE ASK THIS COURT TO DO SO.

10         ON THE ISSUE ABOUT WHEN HE CAME OUT, I WOULD POINT

11  OUT THIS TO THE COURT AS THE DEFENDANT HIMSELF EXPLAINS IN HIS

12  VERSION OF THE EVENTS IN THE PSR, AND, THAT IS, WHEN HE CAME

13  OUT FROM HIS EARLIER OFFENSE, HE DID NOT HAVE A DOLLAR TO HIS

14  NAME.  HE DIDN'T HAVE ANY FAMILY.  HE DIDN'T HAVE ANY PLACE TO

15  STAY, AND UNLIKE THE FEDERAL SYSTEM WHICH IS WISE IN SETTING UP

16  A HALFWAY HOUSE OR ELECTRONIC MONITORING OR SOMETHING TO GET A

17  PERSON BACK INTO SOCIETY AND GET HIM INTO A JOB, HE HAD

18  NOTHING.

19         AGAIN IT DOESN'T CONDONE HIS CONDUCT, BUT IT EXPLAINS

20  IT SOMEWHAT THAT WHEN HE MADE WHAT WAS CLEARLY A MISTAKE,

21  INTENTIONAL MISTAKE TO GOING BACK TO WHAT IS NOW HIS CURRENT

22  CRIME THAT HE'S IN FRONT OF THIS COURT ON, BUT WHEN YOU'RE

23  WITHOUT A DOLLAR AND WITHOUT FAMILY AND WITHOUT A PLACE TO

24  STAY, YOU SOMETIMES MAKE THE MISTAKE OF GETTING BACK TOGETHER

25  WITH THE PEOPLE YOU WERE WITH BEFORE THAT GOT YOU IN TROUBLE IN

1   THE FIRST PLACE.  YOU HAVE TO TAKE RESPONSIBILITY FOR IT WHICH

2   HE HAS, BUT IT EXPLAINS THE CONDUCT SOMEWHAT.

3          YOUR HONOR, WE ARE -- PURSUANT TO THE NEGOTIATED PLEA

4   AGREEMENT, THE GOVERNMENT AGREES THAT THE DEFENDANT -- THAT

5   THERE WOULD BE A RECOMMENDATION THAT THE DEFENDANT BE SENTENCED

6   ON THE LOW END OF WHATEVER IS THE PERTINENT GUIDELINES RANGE.

7          WE WOULD ASK THE COURT ALSO FOR A RECOMMENDATION THAT

8   MR. NIDA AS THE PSR PROVIDES A BASIS FOR BE -- THAT THERE BE A

9   RECOMMENDATION FROM THE COURT THAT HE BE ADMITTED INTO THE

10  FORMAL BUREAU OF PRISONS DRUG AND ALCOHOL PROGRAM.  I BELIEVE

11  IT USED TO BE CALLED SOMETHING LIKE THE 500-HOUR PROGRAM, BUT

12  IT IS THE OFFICIAL PROGRAM OF THE BUREAU OF PRISONS.

13         HE WANTS TO BE NEAR HIS CHILDREN IF HIS CHILDREN CAN

14  BE BROUGHT TO HIM AT THE APPROPRIATE TIME IN AGE, AND THAT'S

15  ALL UP TO THE DECISION OF, I SUSPECT, THE MOTHER, BUT HE HAS

16  ASKED THAT THERE COULD BE A RECOMMENDATION FROM THE COURT FOR

17  THE ATLANTA CAMP, AND THAT'S DIFFERENT THAN MOST PEOPLE WHOM

18  THE COURT HEARS FROM WHERE THEY WANT TO GO TO MAXWELL BECAUSE

19  IT'S A LOT BETTER STAYING AT THE AIR FORCE BASE THAN IT IS AT

20  THE ATLANTA CAMP --

21         THE COURT:  I DON'T MIND RECOMMENDING HE BE HOUSED

22  NEAR ATLANTA.  I DON'T KNOW WITH HIS RECORD HE'S GOING TO

23  QUALIFY FOR A CAMP, BUT THAT'S NOT UP TO ME.

24         MR. BEVER:  WELL, YOUR HONOR, I BELIEVE THAT THE CUT-

25  OFF, AT LEAST WHAT IT US USED TO BE WAS A TEN-YEAR SENTENCE.  I

ANDRE G. ASHLEY, O.C.R.

1   MAY BE WRONG ABOUT THAT NOW.

2          THE COURT:  WELL, I DON'T CLAIM TO UNDERSTAND

3   EVERYTHING THAT THE BUREAU OF PRISONS DOES.  IN FACT I'M NOT,

4   BUT I GOT INVOLVED WITH SOME KIND OF COMPUTATION THEY MADE, AND

5   I FOUND OUT THAT THEY TOOK INTO CONSIDERATION A LOT MORE THAN

6   JUST THE SENTENCE.

7          MR. BEVER:  WELL, I WOULD ASK FOR THE COURT'S

8   RECOMMENDATION.

9          THE COURT:  BUT I'M HAPPY TO MAKE A RECOMMENDATION

10  NEAR ATLANTA FOR THE CONVENIENCE OF HIS FAMILY, NOT HIS

11  CONVENIENCE BUT FOR THE CONVENIENCE OF HIS FAMILY.  I CANNOT

12  REQUIRE THEM TO PUT HIM IN A PARTICULAR PLACE, BUT HE'S BETTER

13  OFF WITH THAT RECOMMENDATION THAN NOT.  OKAY.

14         MR. BEVER:  I WOULD ALSO ASK, YOUR HONOR, THAT HE

15  REMAIN ON BOND UNTIL THE BUREAU OF PRISONS ASSIGNS HIM TO A

16  FACILITY.  HE IS ON BOND.  HE HAS BEEN ON BOND SINCE THE TIME

17  HE WAS ARRESTED IN THIS CASE.  HE'S NOT HAD ANY VIOLATIONS OF

18  THAT BOND.  THERE'S BEEN NO INDICATION WHATSOEVER THAT HE'S

19  BEEN ENGAGED IN ANY KIND OF ILLEGAL ACTIVITY.  THERE'S BEEN NO

20  INDICATION THAT HE HAS BEEN ANY KIND OF RISK OF FLIGHT, AND

21  THAT HE HAS, IF ANYTHING, BEEN COMPLIMENTED BY HIS SUPERVISORY

22  PAROLE -- NOT PAROLE BUT PROBATION OFFICER MR. BRISCO IN TERMS

23  OF DOING WHAT HE'S BEING TOLD TO DO AND NOT DOING WHAT HE'S NOT

24  TOLD TO DO.

25          ON THAT, YOUR HONOR, I BELIEVE THAT MY CLIENT WOULD


                    ANDRE G. ASHLEY, O.C.R.

1   LIKE TO ADDRESS THE COURT, AND I WOULD ASK HIM TO DO SO AT THIS

2   TIME IF THE COURT IS READY.

3           THE COURT:  THAT'S FINE, AND IT'S TIME.  HE CAN

4   REMAIN WHERE HE IS.  JUST PULL ONE OF THE MICROPHONES OVER

5   THERE IN FRONT OF YOU.

6           MR. BEVER:  IF IT'S ALL RIGHT WITH THE COURT, HE MAY

7   FEEL MORE COMFORTABLE BEING UP HERE.

8           THE COURT:  WHICHEVER YOU WANT.  IF YOU WANT TO STEP

9   UP HERE WITH MR. BEVER, THAT'S FINE, OR IF YOU WISH TO REMAIN

10  THERE IN FRONT OF THAT MICROPHONE, THAT'S FINE.

11          THE DEFENDANT:  YOUR HONOR, I WOULD LIKE TO ADDRESS

12  THE COURT WITH AN APOLOGY.  I WANT TO APOLOGIZE TO THE VICTIMS,

13  APOLOGIZE TO THE COURT FOR WASTING ITS TIME WITH MY BEHAVIOR,

14  AND I ALSO WANT TO APOLOGIZE TO MY FAMILY FOR LETTING THEM

15  DOWN, AND FOR JUST BEING TAKEN OUT OF THEIR LIVES WHEN THEY

16  NEED ME THE MOST, AND I'M JUST SORRY.  THANK YOU.

17          THE COURT:  ALL RIGHT.  THANK YOU.  DOES THE

18  GOVERNMENT WISH TO BE HEARD FURTHER?

19          MS. BLACK:  BRIEFLY, YOUR HONOR, BECAUSE I ADDRESSED

20  JUST THE VARIANCE BEFORE, AND I HAVEN'T ADDRESSED THE ULTIMATE

21  SENTENCE.

22          THE COURT:  WELL, WE HAVE GOTTEN DOWN CLOSE TO THE

23  END.

24          MS. BLACK:  OKAY.  WELL, YOUR HONOR, MR. BEVER IS

25  RIGHT I DID AGREE IN THE PLEA AGREEMENT TO RECOMMEND A LOW END


                        ANDRE G. ASHLEY, O.C.R.

1  SENTENCE IN THIS CASE, AND I BELIEVE THAT THE COURT WILL FIND

2  THE GUIDELINE RANGE IN THIS CASE TO BE 92 TO 115 MONTHS IF

3  THOSE VARIANCES ARE DENIED, AND SO THAT IS THE SENTENCE THAT

4  THE GOVERNMENT WOULD BELIEVE IS APPROPRIATE IN THIS CASE IS A

5  92 MONTH, LOW END GUIDELINE SENTENCE.

6              THE REASONS FOR THAT ARE PRIMARILY BECAUSE OF THE

7  SCOPE OF THE CRIME IN THIS CASE, JUST HOW LARGE IT WAS, HOW

8  MANY PEOPLE AND GOVERNMENT ENTITIES IT VICTIMIZED.  THERE MAY

9  BE SOME QUIBBLES WITH THE AMOUNT OF THE RESTITUTION ORDER, BUT

10 THOSE APPEAR TO BE AROUND THE EDGES, IT WAS CERTAINLY IN THE

11 NEIGHBORHOOD OF 2 MILLION DOLLARS.  THAT'S A LOT OF MONEY, YOUR

12 HONOR, AND A LOT OF DIFFERENT PEOPLE WERE HURT TO GET TO THAT

13 RESULT.

14             SO TO REFLECT THE SERIOUSNESS OF THE OFFENSE AND TO

15 PROMOTE RESPECT FOR THE LAW, PROVIDE JUST PUNISHMENT, A

16 GUIDELINE SENTENCE IS APPROPRIATE.  ALSO TO DETER OTHERS.

17             AS I SAID BEFORE, MR. NIDA HAD A REAL SECOND CHANCE

18 AT AGE 30 OUT ON PAROLE, MARRYING AN ATTORNEY, FREE FROM

19 FINANCIAL NEED WHEN HE MADE A DECISION TO TURN BACK TO THE

20 CRIMINAL CONDUCT IN THIS CASE, AND IN FACT TO RAMP IT UP, TO

21 ENGAGE IN FRAUDULENT SCHEMES ON A LARGER SCALE, A MORE

22 SOPHISTICATED SCALE THAN HE HAD DONE PREVIOUSLY.

23             I WANT TO TALK JUST FOR A MOMENT ABOUT THAT

24 SOPHISTICATION.  IT'S IN THE CRIMINAL INFORMATION, BUT MR. NIDA

25 SET UP FAKE CREDIT AGENCIES AS PART OF HIS SCHEME SO THAT HE

ANDRE G. ASHLEY, O.C.R.

1   COULD METHODICALLY HARVEST LARGE QUANTITIES OF PERSONAL

2   INFORMATION ABOUT FOLKS TO STEAL THEIR IDENTITY AS EFFICIENTLY

3   AS POSSIBLE IN THIS SCHEME.

4        SO THAT WHEN MR. NIDA SENT SOMEONE INTO A BANK TO

5   OPEN AN ACCOUNT, THEY ALREADY HAD A COMPLETE DOSSIER ON THE

6   INTENDED IDENTITY THEFT VICTIM.   THEY WERE READY TO ANSWER

7   CORRECTLY ANY CHALLENGE QUESTION WHICH COULD BE PRESENTED TO

8   THE BANK BECAUSE HE ALREADY HAD ACCESS TO ALL THOSE DATABASE

9   RESULTS FROM THE FAKE CREDIT AGENCIES.   FAKE CAR DEALERSHIPS IN

10  ORDER TO GET CAR LOANS, SHOW THAT THEY HAD COLLATERAL ON THOSE

11  LOANS, AND IDENTITY THEFT VICTIMIZING MANY, MANY, PEOPLE.   SO

12  THAT'S A BREATHTAKINGLY COMPLICATED AND NASTY SCHEME.

13       IT'S ALSO OF NOTE THAT IT CONTINUED UNTIL AGENTS OF

14  THE UNITED STATES SECRET SERVICE BROUGHT IT TO A STOP ON

15  SEPTEMBER 13TH, 2013, AND SO EVEN AS MR. NIDA'S PERSONAL

16  FORTUNE IMPROVED, EVEN AS HIS FAME AND NOTORIETY INCREASED WITH

17  HIS ROLE ON TELEVISION, AND EVEN AS HE WAS IN HIS MARRIAGE FOR

18  LONGER, AS THE MEMORY OF HIS INCARCERATION WENT INTO THE PAST,

19  HE DIDN'T STOP HIS CONDUCT.   HE CONTINUED IT.

20       THE SCHEME CONTINUED TO BECOME MORE COMPLEX, AND IT

21  WAS ONLY WHEN AGENTS CONFRONTED HIM AND SEIZED HIS COMPUTER

22  THAT HE STOPPED THIS CONDUCT.   SO DETERRENCE IS THE OTHER

23  REASON WHY A GUIDELINES SENTENCE IS REQUIRED.

24       THIS IS BIG MONEY THAT MR. NIDA MADE.   A LOT OF

25  PEOPLE WOULD BE WILLING TO DO A STRETCH IN PRISON IF THEY COULD


ANDRE G. ASHLEY, O.C.R.

1    LIVE HIGH FOR A WHILE AND MAKE BIG MONEY AND HAVE SOME

2    NOTORIETY TO GO ALONG WITH IT.  THERE SHOULD BE A GUIDELINE

3    SENTENCE IN THIS CASE SO THAT WHEN FOLKS VIEW THIS RESULT THEY

4    WILL NOT VIEW IT AS A THING THAT THEY WOULD WANT TO MAKE THAT

5    CHOICE, BUT INSTEAD AS A TEACHING THE OTHER WAY OF THE CHOICE

6    TO BE AVOIDED.

7            MR. NIDA ALSO APPEARS TO PERSONALLY NEED ADDITIONAL

8    DETERRENCE.  AGAIN HE SERVED SIX YEARS IN HIS LAST STRETCH IN

9    PRISON, AND IMMEDIATELY RETURNED TO AND AMPLIFIED HIS

10   FRAUDULENT CONDUCT.  SO SIX YEARS DID NOT DO IT.  THOSE ARE THE

11   REASONS WHY A GUIDELINE SENTENCE OF 92 MONTHS IS APPROPRIATE IN

12   THIS CASE.  THANK YOU, YOUR HONOR.

13           MR. BEVER:  YOUR HONOR, IF I MAY ADDRESS THE COURT ON

14   AN ADMINISTRATIVE MATTER, AND, THAT IS, SIMPLY ON THE 5K

15   REDUCTION IF THE COURT COULD MAKE A RECORD OF SOME TYPE

16   WHATEVER IS APPROPRIATE THAT ON THE 5K1.1, IF YOU WILL, WHAT

17   THAT IS FOR SO THERE'S NO CONFUSION LATER ON IF THERE ENDS UP

18   BEING ANY OTHER SCENARIO WHERE WE END UP BEING IN FRONT OF THE

19   COURT AGAIN.  AUSA BLACK AND I TALKED ABOUT THAT THIS MORNING.

20   SO I THINK THAT'S APPROPRIATE IN THIS CIRCUMSTANCE.

21           THE COURT:  WELL, I'VE GOT THE GOVERNMENT'S MOTION

22   AND I'VE GOT YOUR BRIEF.  DO YOU REALLY NEED ANYTHING MORE IN

23   THE RECORD THAN THAT?

24           MS. BLACK:  THE PROBLEM IS, YOUR HONOR, THE

25   GOVERNMENT'S MOTION REFERS TO CERTAIN MATTERS AND CLEARLY SETS


                    ANDRE G. ASHLEY, O.C.R.

1 OUT WHAT'S THE BASIS FOR THE MOTION, AND I THINK THAT THE

2 DEFENDANT'S BRIEF BRINGS UP MORE INFORMATION, AND IF THE COURT

3 COULD MAKE A RECORD OF WHAT IT'S RELYING ON FOR THE FIVE LEVELS

4 SINCE THE TWO MOTIONS DON'T SAY THE SAME THING, THAT'S WHAT MR.

5 BEVER, I THINK, IS ASKING.

6          MR. BEVER:  I WOULD ANTICIPATE THAT THE RELIANCE,

7 YOUR HONOR, WOULD BE ON THE GOVERNMENT'S MOTION AND WHAT'S

8 CONTAINED WITHIN ITS MOTION.

9          THE COURT:  YES, SIR, BUT I'VE ALSO TAKEN INTO

10 CONSIDERATION THE FACTS THAT YOU SET OUT TO APPROVE THE

11 GOVERNMENT'S MOTION.

12          MS. BLACK:  YOUR HONOR, DID YOU APPROVE THE

13 GOVERNMENT'S MOTION FOR THE REASONS STATED IN THE GOVERNMENT'S

14 MOTION?

15          THE COURT:  SURE.

16          MS. BLACK:  THANK YOU.

17          MR. BEVER:  THANK YOU, YOUR HONOR.

18          THE COURT:  YES.  OKAY.  WELL, THE GUIDELINE RANGE IN

19 THIS PARTICULAR CASE OF COURSE STARTED OUT SOMEWHERE BETWEEN 15

20 AND 20 YEARS.  BECAUSE OF THE GOVERNMENT'S MOTION FOR A

21 DOWNWARD DEPARTURE UNDER 5K, THE GUIDELINE CALCULATION COMES

22 SIGNIFICANTLY DOWN.

23          MR. BEVER IS A VERY EXCELLENT LAWYER AND MAKES VERY

24 PERSUASIVE ARGUMENTS AND HAS DONE VERY WELL REPRESENTING HIS

25 CLIENT IN THIS MATTER.  SO WE'RE NOW DOWN IN A RANGE OF

ANDRE G. ASHLEY, O.C.R.

1   GENERALLY EIGHT OR NINE YEARS, SEVEN TO NINE YEARS.

2           SO, LET'S SEE, I REALLY NEED TO RULE ON AS TO WHETHER

3   OR NOT THERE OUGHT TO BE A VARIANCE AS TO UPBRINGING, THE COURT

4   WILL DENY ANY KIND OF VARIANCE FOR THAT REASON.  THE COURT

5   FINDS THAT HE'S -- I'LL AGREE THAT HE HAD A HARD UPBRINGING.

6   HOWEVER, AT THIS POINT HE'S 35 YEARS OLD.  HE'S BEYOND THE

7   UPBRINGING.  HE'S CLIMBED OUT OF POVERTY.

8           HE WAS SENTENCED TO 18 YEARS IN CONFINEMENT WITH THE

9   STATE AFTER A JURY TRIAL AT AGE 24 FOR EXTENSIVE INVOLVEMENT

10  WITH A CAR THEFT RING, AND THEY SAY RICO, BUT MY INTERPRETATION

11  IS THAT WAS A CAR THEFT RING HE WAS INVOLVED IN, AND HE'S HAD

12  OTHER OFFENSES FOR WHICH HE'S BEEN ON PROBATION AND MORE THAN

13  ONCE HAD PROBATION REVOKED.  SO AT THIS TIME IT SEEMS TO ME

14  THAT HIS CHARACTER SEEMS TO BE SET.  WE'RE BEYOND UPBRINGING.

15          AS TO THE VARIANCE FOR CRIMINAL HISTORY, WELL THE

16  COURT WILL DENY THAT.  THE CRIMINAL HISTORY THAT WE'VE ALREADY

17  STATED ADEQUATELY REFLECTS ALL THE ACTIVITIES THAT HE'S BEEN

18  IN, AND THE PROBATION OFFICER IS ONE POINT SHY, AND THEN, OF

19  COURSE, THERE'S BEEN ANOTHER POINT DISPUTE.

20          SO FOR THE APPELLATE COURT, THE GUIDELINE CALCULATION

21  AT THIS POINT IS 30 YEARS, NO MANDATORY MINIMUM, TOTAL OFFENSE

22  LEVEL OF 24 YIELDS A CUSTODY GUIDELINE RANGE OF 92 TO 111

23  MONTHS --

24          THE PROBATION OFFICER:  THAT WOULD BE 115, YOUR

25  HONOR.


                    ANDRE G. ASHLEY, O.C.R.

1          THE COURT:  I'M SORRY, 92 TO 115 MONTHS, FINE

2    GUIDELINE RANGE OF 10,000 TO A HUNDRED THOUSAND, RESTITUTION

3    STILL TO BE DETERMINED, AND WHY DON'T I DO THIS, AT THIS POINT

4    I'LL JUST SET A HEARING FOR NEXT THURSDAY AT TEN O'CLOCK.  IF

5    IN THE MEANTIME YOU ALL CAN MEET AND COME TO AN AGREEMENT ON

6    RESTITUTION, THEN YOU CAN INFORM THE COURT, AND WE WILL NOT

7    HAVE TO GO FORWARD WITH THAT HEARING.  THERE'S A SPECIAL

8    ASSESSMENT 100 DOLLARS, NO PROBATION OPTION, SUPERVISED RELEASE

9    OF THREE TO FIVE YEARS.  IF THERE IS NOTHING ELSE THE COURT

10   WILL PROCEED WITH SENTENCING.

11         PURSUANT TO THE SENTENCING REFORM ACT OF 1984, IT IS

12   THE JUDGMENT OF THE COURT THAT THE DEFENDANT APOLLO NIDA IS

13   HEREBY COMMITTED TO THE CUSTODY OF THE BUREAU OF PRISONS TO BE

14   IMPRISONED FOR A TERM OF 96 MONTHS AS TO COUNT 1.  IT'S FURTHER

15   ORDERED HE PAY THE UNITED STATES A SPECIAL ASSESSMENT OF 100

16   DOLLARS THAT WILL BE DUE IMMEDIATELY.

17         THE COURT FINDS THAT HE DOES NOT HAVE THE ABILITY TO

18   PAY A FINE AND COST OF INCARCERATION, AND THAT'S WAIVED

19   PARTICULARLY IN VIEW OF THE LARGE AMOUNT OF RESTITUTION HE'S

20   GOING HAVE TO MAKE.

21         IT WILL BE ORDERED AT THE RESTITUTION HEARING THAT

22   HE'S TO MAKE THE RESTITUTION JOINTLY AND SEVERALLY WITH GAYLA

23   O'NEAL ST. JULIEN.  DEFENDANT SHALL NOTIFY THE U.S. ATTORNEY OF

24   THIS DISTRICT WITHIN 30 DAYS OF ANY CHANGE OF HIS MAILING OR

25   RESIDENCE ADDRESS THAT OCCURS WHILE ANY PORTION OF THE

1  RESTITUTION REMAINS UNPAID.

2          HE SHALL MAKE RESTITUTION PAYMENTS FROM ANY WAGES HE

3  EARNS IN PRISON IN ACCORDANCE WITH THE BUREAU OF PRISONS

4  FINANCIAL RESPONSIBILITY PROGRAM.  ANY PORTION OF THE FINE NOT

5  PAID IN FULL AT THE TIME OF HIS RELEASE -- ANY PORTION OF THE

6  RESTITUTION, EXCUSE ME, NOT PAID IN FULL AT THE TIME OF HIS

7  RELEASE FROM IMPRISONMENT SHALL BECOME A CONDITION OF

8  SUPERVISION AND BE PAID AT A MONTHLY RATE OF NOT LESS THAN 150

9  DOLLARS PLUS 25 PERCENT OF ANY GROSS INCOME EXCEEDING 2300 PER

10 MONTH.

11         UPON RELEASE FROM IMPRISONMENT, HE SHALL BE PLACED ON

12 SUPERVISED RELEASE FOR A TERM OF FIVE YEARS AS TO COUNT 1, AND

13 WITHIN 72 HOURS OF RELEASE FROM THE BUREAU OF PRISONS, HE SHALL

14 REPORT TO THE PROBATION OFFICE IN THE DISTRICT TO WHICH HE'S

15 RELEASED.

16         WHILE ON SUPERVISED RELEASE, HE SHALL NOT COMMIT

17 ANOTHER FEDERAL, STATE OR LOCAL CRIME, COMPLY WITH THE STANDARD

18 CONDITIONS THAT HAVE BEEN ADOPTED BY THE COURT AND THESE

19 ADDITIONAL CONDITIONS.

20         ONE, HE SHALL SUBMIT TO DRUG TESTING AS REQUESTED TO

21 DO SO BY THE UNITED STATES PROBATION OFFICER.

22         TWO, PURSUANT TO THE CODE SECTION REQUIRES A

23 MANDATORY DNA TESTING, HE SHALL COOPERATE IN THE COLLECTION OF

24 DNA.

25         THREE, HE SHALL NOT INCUR NEW CREDIT CHARGES OR OPEN


ANDRE G. ASHLEY, O.C.R.

1   ADDITIONAL LINES OF CREDIT WITHOUT THE APPROVAL OF THE

2   PROBATION OFFICER.

3           FOUR, HE SHALL MAKE FULL AND COMPLETE DISCLOSURES OF

4   HIS FINANCES AND SUBMIT TO AN AUDIT OF ANY FINANCIAL DOCUMENTS

5   AT THE REQUEST OF THE PROBATION OFFICER.

6           FIVE, HE SHALL PAY ANY PENALTY IMPOSED BY THIS

7   JUDGMENT AND REMAINS UNPAID AT THE COMMENCEMENT OF HIS TERM OF

8   SUPERVISED RELEASE.

9           SIX, HE SHALL PERFORM 100 HOURS OF COMMUNITY SERVICE

10  UNDER THE GUIDANCE AND SUPERVISION OF THE PROBATION OFFICER.

11          SEVEN, HIS TRAVEL OUTSIDE THE NORTHERN DISTRICT OF

12  GEORGIA SHALL BE LIMITED TO VERIFIED EMPLOYMENT WITHIN THE

13  UNITED STATES AND SHALL NOT EXCEED SEVEN CALENDAR DAYS PER

14  MONTH NOR WILL IT EXCEED SEVEN CONSECUTIVE DAYS PER CALENDAR

15  MONTH.

16          EIGHT, HE SHALL NOT OWN, POSSESS OR HAVE UNDER HIS

17  CONTROL ANY FIREARM, DANGEROUS WEAPON OR OTHER DESTRUCTIVE

18  DEVICE.

19          NINE, HE SHALL PARTICIPATE IN A DRUG/ALCOHOL

20  TREATMENT PROGRAM UNDER THE GUIDANCE AND SUPERVISION OF THE

21  PROBATION OFFICER AND CONTRIBUTE TO THE COST.

22          AND, TEN, HE SHALL SUBMIT TO A SEARCH OF HIS PERSON,

23  HIS PROPERTY REAL OR PERSONAL, RENTAL, RESIDENCE, OFFICE OR ANY

24  VEHICLE AT THE REQUEST OF THE PROBATION OFFICER.

25          MR. NIDA, DO YOU UNDERSTAND THE SENTENCE?


                    ANDRE G. ASHLEY, O.C.R.

1          THE DEFENDANT:  YES, SIR, ALL EXCEPT FOR THE TRAVEL

2    ISSUE THAT IS UPON RELEASE, YOU'RE STIPULATING THAT.

3          THE COURT:  WHEN YOU'RE ON -- THIS COULD BE MODIFIED

4    AT THE TIME BY MYSELF UPON A RECOMMENDATION OF THE PROBATION

5    OFFICER, BUT AT THIS TIME I'M LIMITING YOUR TRAVEL OUTSIDE THE

6    NORTHERN DISTRICT OF GEORGIA TO VERIFIED EMPLOYMENT WITHIN THE

7    UNITED STATES, AND YOU SHALL NOT GO OUTSIDE THE NORTHERN

8    DISTRICT OF GEORGIA MORE THAN SEVEN CALENDAR DAYS PER MONTH NOR

9    WILL IT EXCEED SEVEN CONSECUTIVE DAYS PER CALENDAR MONTH.

10          THE DEFENDANT:  UNDERSTOOD.

11          THE COURT:  OKAY.  ANY OTHER PARTS OF THE SENTENCE

12    THAT YOU HAVE QUESTIONS ABOUT OR YOU'RE NOT SURE?

13          THE DEFENDANT:  I REALLY WASN'T SURE IF I WAS LOOKING

14    AT THE LOW END OF THE GUIDELINE, THE 92 MONTHS VERSUS THE 96

15    MONTHS, AND IN THE PLEA AGREEMENT IT WAS STIPULATED THAT THE

16    GOVERNMENT WOULD RECOMMEND THE LOW END.  SO I KIND OF DIDN'T

17    UNDERSTAND HOW IT FELL IN THE MIDDLE.

18          THE COURT:  WELL, I'M GETTING READY TO ADDRESS THAT.

19    THAT WAS MERELY A RECOMMENDATION TO THE COURT.  THE COURT CAN

20    GO UP OR DOWN IN THE GUIDELINES.  IN FACT, THE COURT CAN GO

21    OUTSIDE THE GUIDELINES, BUT UNDER THE CIRCUMSTANCES I THINK

22    EIGHT YEARS, THAT COMPUTES TO EIGHT YEARS, A NICE ROUND NUMBER,

23    AND CONSIDERING YOU STARTED AT 20 YEARS AND NOW YOU'RE DOWN TO

24    EIGHT YEARS AND YOU'RE A MULTIPLE OFFENDER, THE OFFENSE

25    HAPPENED OVER A PERIOD OF MORE THAN FOUR YEARS AND INVOLVED

1  MULTIPLE ACTS.  IT WAS NOT A SINGLE ACT UNDER THE HEAT OF

2  PASSION OR ON THE SPUR OF THE MOMENT.  IT FIT A PATTERN THAT

3  YOU HAVE BEEN IN IN YOUR PRIOR OFFENSES.  THE COURT BELIEVES

4  THAT THAT IS A LOW SENTENCE CONSIDERING EVERYTHING.

5          THE COURT HAS IN MIND THE VARIOUS FACTORS OF 18, USC,

6  3553(A) OF THE VARIOUS SENTENCING FACTORS, AND WHILE THE COURT

7  HOPES THAT YOU WILL NEVER APPEAR IN COURT AGAIN, THE COURT HAS

8  ITS DOUBTS AS TO YOUR PROPENSITY TO BE A RECIDIVIST.  I'VE

9  NOTED THAT PEOPLE IN THE CON BUSINESS, FORGERY BUSINESS SEEM TO

10  GET IT IN THEIR BLOOD.  IT'S AN EASY WAY TO MAKE MONEY, AND

11  THEY SEEM TO REVERT TO THAT LIFESTYLE.  SO THOSE ARE MY REASONS

12  FOR SETTING THAT SENTENCE AT THAT AMOUNT, EVEN THOUGH THE

13  GOVERNMENT RECOMMENDED A SLIGHTLY LOWER SENTENCE.

14          IS THERE ANY OBJECTION BY EITHER SIDE OTHER THAN

15  THOSE PREVIOUSLY STATED FOR THE RECORD TO THE ULTIMATE FINDINGS

16  OF THE COURT, THE GUIDELINE CALCULATIONS OR TO THE SENTENCE OR

17  THE MANNER IN WHICH IT'S BEEN PRONOUNCED ON BEHALF OF THE

18  GOVERNMENT?

19          MS. BLACK:  NONE, YOUR HONOR.

20          THE COURT:  ON BEHALF OF THE DEFENDANT?

21          MR. BEVER:  NO, YOUR HONOR.

22          THE COURT:  ALL YOUR OBJECTIONS ARE PRESERVED --

23          MR. BEVER:  YES, YOUR HONOR.

24          THE COURT:  -- THAT YOU PREVIOUSLY MADE.  LET ME

25  ADVISE THE DEFENDANT THAT HE HAS THE RIGHT TO APPEAL.  HE CAN

ANDRE G. ASHLEY, O.C.R.

1  APPEAL HIS CONVICTION IF HE BELIEVES HIS GUILTY PLEA WAS

2  SOMEHOW UNLAWFUL OR INVOLUNTARY OR IF THERE IS SOME SORT OF

3  FUNDAMENTAL DEFECT IN THE PROCEEDING THAT WAS NOT WAIVED BY

4  YOUR GUILTY PLEA.

5          YOU ALSO HAVE A STATUTORY RIGHT TO APPEAL YOUR

6  SENTENCE UNDER CERTAIN CIRCUMSTANCES PARTICULARLY IF YOU THINK

7  THE SENTENCE IS CONTRARY TO THE LAW, AND YOU MAY HAVE WAIVED

8  SOME OF THOSE RIGHTS IN THE PLEA AGREEMENT, AND USUALLY THOSE

9  WAIVERS ARE ENFORCEABLE, BUT IF YOU BELIEVE THE WAIVER IS

10 UNENFORCEABLE, YOU CAN PRESENT THAT THEORY TO THE APPELLATE

11 COURT, AND WITH FEW EXCEPTIONS ANY NOTICE OF APPEAL MUST BE

12 FILED BY YOU WITHIN 14 DAYS OF YOUR JUDGMENT BEING ENTERED IN

13 THE CASE WHICH SHOULD HAPPEN LATER TODAY OR TOMORROW, AND IF

14 YOU'RE UNABLE TO PAY THE COST OF AN APPEAL, YOU MAY APPLY FOR

15 LEAVE TO FILE YOUR APPEAL WITHOUT PAYING COSTS, AND IF YOU

16 REQUEST, THE CLERK OF COURT WILL PREPARE AND FILE A NOTICE OF

17 APPEAL ON YOUR BEHALF.

18          DO YOU UNDERSTAND YOUR RIGHT TO AN APPEAL?

19          THE DEFENDANT:  YES, SIR, I DO.  I HAVE ONE MORE

20 QUESTION.

21          THE COURT:  ALL RIGHT.

22          THE DEFENDANT:  WHAT ABOUT THE REHABILITATION

23 PROGRAM, THE DRUG PROGRAM, I NEVER HEARD ANY MENTION OF THAT?

24          MR. BEVER:  THE RECOMMENDATION FOR --

25          THE COURT:  I'M GOING TO RECOMMEND TO BUREAU OF


ANDRE G. ASHLEY, O.C.R.

1   PRISONS THAT THEY PUT YOU IN THIS DRUG REHABILITATION PROGRAM,

2   THAT'S NOT THE EXACT NAME, BUT THEY KNOW WHAT IT IS.  IT'S

3   CHANGED.  THAT'S WHAT MR. BEVER WAS TALKING ABOUT.  SOMETIMES

4   IF YOU COMPLETE THAT PROGRAM, YOU'RE RELEASED EARLIER THAN

5   NORMAL FROM THE PENITENTIARY.  I WILL ALSO RECOMMEND THAT YOU

6   BE HOUSED NEAR ATLANTA FOR THE CONVENIENCE OF YOUR FAMILY.

7            NOW THERE ARE SOME OTHER PROGRAMS OR AT LEAST ONE

8   OTHER THAT I CAN THINK OF THAT THE BUREAU OF PRISONS HAS THAT

9   YOU MAY BE ELIGIBLE FOR.  IT'S KIND OF A HALFWAY PROGRAM TOWARD

10  THE END OF YOUR SENTENCE, BUT YOU NEED TO TALK TO YOUR

11  COUNSELOR IN THE BUREAU OF PRISONS AND THOSE OFFICIALS ABOUT

12  THOSE PROGRAMS.  THEY CAN GIVE YOU MUCH MORE ACCURATE

13  INFORMATION THAN I CAN.

14           ANYTHING ELSE?

15           THE DEFENDANT:  NO, SIR.

16           THE COURT:  IS THERE ANY REASON NOT TO LET HIM

17  VOLUNTARY SURRENDER?

18           MS. BLACK:  I DON'T OBJECT TO VOLUNTARY SURRENDER,

19  YOUR HONOR.

20           THE COURT:  I'LL PLACE HIM ON VOLUNTARY SURRENDER.

21  THAT MEANS, MR. NIDA, YOU REMAIN UNDER THE SAME CONDITIONS OF

22  YOUR BOND.  YOU'LL BE NOTIFIED BY THE PENITENTIARY SYSTEM WHERE

23  AND WHEN TO REPORT.  I SUGGEST THAT YOU NOT GET IN ANY TROUBLE

24  BETWEEN NOW AND THAT REPORT DATE.  IF YOU DO, YOU'LL BE BACK

25  REAL QUICK.


                    ANDRE G. ASHLEY, O.C.R.

1          THE DEFENDANT:  YES, SIR.

2          THE COURT:  ALL RIGHT.  IS THERE ANYTHING ELSE TO

3    TAKE UP IN MR. NIDA'S CASE.

4          MS. BLACK:  NOTHING FROM THE GOVERNMENT, YOUR HONOR.

5          MR. BEVER:  NOT FOR THE DEFENSE, YOUR HONOR.

6          THE COURT:  THANK YOU VERY MUCH.  WE'LL BE IN

7    RECESS.

8          (PROCEEDINGS CONCLUDED.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25


                   ANDRE G. ASHLEY, O.C.R.

1
2                    C-E-R-T-I-F-I-C-A-T-E
3
4   UNITED STATES OF AMERICA
5   NORTHERN DISTRICT OF GEORGIA
6
7          I, ANDRE G. ASHLEY, DO HEREBY CERTIFY THAT I AM A
8   U.S. DISTRICT REPORTER FOR THE NORTHERN DISTRICT OF GEORGIA,
9   THAT I REPORTED THE FOREGOING AND THE SAME IS A TRUE AND
10  ACCURATE TRANSCRIPTION OF MY MACHINE SHORTHAND NOTES AS TAKEN
11  AFORESAID.
12         IN TESTIMONY WHEREOF I HAVE HEREUNTO SET MY HAND ON
13     THIS 5TH DAY OF SEPTEMBER, 2014.
14
15
16
17
18
19                                   ANDRE G. ASHLEY
                                     OFFICIAL COURT REPORTER
20                                   NORTHERN DISTRICT OF GEORGIA
21
22
23
24
25


                      ANDRE G. ASHLEY, O.C.R.